## WILLIAM B. VINCENT v. WILLIAM S. RATHER.

Whether commission merchants and warehousemen are liable for losses by fire depends upon the question of prudence, diligence, and good faith. (Paschal's Dig., Art. 3803, Note 888.)

Where cotton is sent to a commission house for sale, the consignee is held to an implied contract to store in a safe manner and to sell to the best advantage.

Where a commission house advertises that they will store cotton consigned to them in a fire-proof warehouse, they are liable if they store in a wooden warehouse which is exposed to fire and less safe.

It is no answer to a charge of want of diligence that, by mistake of the railroad, the cotton was sent to a wrong house and was stored in a less safe place, if, upon the discovery of the mistake, the consignees took control of the cotton, but did not remove it to their own fire-proof house.

Nor will a custom of the merchants of the city not to remove cotton sent to the wrong house by mistake prevail against the general laws governing bailees and factors.

The ratification by the principal of the acts of his agent must be made with a full knowledge of all the facts and circumstances, or it will not be obligatory on the principal, although such facts and circumstances may have been innocently concealed or inadvertently misrepresented.

APPEAL from Harris. The case was tried before Hon. BENJAMIN SHROPSHIRE, one of the district judges.

The material facts are set forth in the opinion of the court.

*Henderson & Whitfield*, for appellant. — I. Commission merchants must conform to the usages of the place where they do business, and they have the power such usages would give them, and can bind the principal to such usages. (1 Pars. on Cont., 80.)

The evidence in this case clearly shows that the usage in Houston always was and is now, when cotton is placed in the wrong warehouse by mistake, when consigned either to a commission merchant or warehouseman, to let it remain there.

Notice having been brought home to appellant, he is clearly bound by the usages of business in the places where

he traffics. (Dwight v. Whitney, 15 Pick., 179; Goodnow v. Tyler, 7 Mass., 36; 2 Greenl. on Ev., §§ 251, 252.)

An agent is bound to that diligence, care, and skill which a reasonable man under similar circumstances would take of his own affairs. (Pars. on Cont., 73.)

Even if the defendants had not notified the plaintiff that his cotton had been stored with Whitmarsh, they were not liable, because every man is presumed to know the usages and customs of trade in the place where he does business. (15 Pick., 179; 7 Mass., 36.)

II. A warehouseman is not liable for any losses by fire, unless he has been guilty of ordinary negligence. (Story on Bail., §§ 446, 455.)

III. The court erred in overruling defendant's motion for a new trial.

*Peter W. Gray,* for appellee, gave a critical statement of the facts.—I. That there was a valid contract will appear from a consideration of the elements necessary to form one. A contract is defined by Blackstone to be, "An agreement, upon sufficient consideration, to do or not to do a particular thing." (2 Black. Com., 446.) Parsons defines it as "An agreement between two or more parties for the doing or not doing of some specified thing." (1 Pars. on Cont., 5.) Mr. Chitty more fully describes a contract to be, " The mutual assent of two or more persons, competent to contract, founded on a sufficient and legal motive, inducement, or consideration, to perform some legal act, or omit to do anything the performance of which is not enjoined by law." (Chitty on Cont., 7.) All the varied forms of definition really express the same qualities as the essential elements of a contract, to wit: Parties capable to give mental assent; that there is a mutual assent; that sufficient inducement, motive, or consideration exists; and that something is to be done or forborne, by one or both, which is legally allowable.

When the consignees received the bill of lading, the legal right to possession of the cotton vested in them, and was delivery to them, so far as the appellee was concerned. It vested a special property in them, on which they might maintain an action for the cotton. (Story on Agency, §§ 34–102, 111, 112.)

They in effect said, though the cotton has been sent by the carrier's mistake to another place, we have accepted it there according to our offer, have released the carrier from responsibility, and hold ourselves bound on our receipt as if delivered at our house. It is believed that no other fair conclusion can be drawn.

But, however that may be, it is certain that the receipt of the bill of lading, acting on it, and after demanding it of the railway agent, and then accepting control of the cotton at Whitmarsh's and sending receipt as at their own warehouse, is full of evidence of their assent to take charge of it as factors, and to store it according to their offer, accepted by Rather. Under all these facts, they were bound to see to its storage in a fire-proof house, or to hold themselves responsible as warehousemen as in their fire-proof house, to the same extent as if instructed to store it there or agreed to be stored there. This was the lawful thing to be performed by them, either as warehousemen or factors, or both, in consideration of the compensation to be received, and in accordance with the assent of the parties, proposed by one and accepted by the other.

In support of these views reference is made to 1 Pars. on Cont., 399, et seq.; Hatchett v. Gibson, 13 Ala., 587.

II. Commission merchants are factors or agents, and as such bound by instructions. They must act with reasonable diligence and good faith. Good faith alone is not sufficient. There must be reasonable skill and a careful obedience to orders on their part. If there is any loss occasioned by their negligence, or mistake, or inadvertence, which might have been fairly guarded against by

ordinary diligence, they will be held responsible therefor. (Story on Bail., § 455; Story on Cont., § 154; Story on Agency, §§ 192–197.)

III. But it is contended by appellant that the usage among warehousemen, in cases of mistake in delivery at Houston, justified Vincent & Owens in permitting the cotton to remain at Whitmarsh's, and relieved them from liability; or, in other words, that local usage of a trade justifies a factor in violating his instructions or agreement.

In the first place, we protest against the admissibility of such testimony at all in such a case, and excepted to it on the trial. It is not denied that usage or local custom of a trade, if uniform, of long continuance, and known to the parties, is admissible to explain the meaning or intention of parties to a contract, or to regulate the duties of agents in their transactions, when acting without special instructions or contract. (1 Pars. on Cont., 73 and note *x*; Story on Agency, § 199.) But we contend that it is a monstrous doctrine to admit a usage to govern as law based on mistakes.

Says Chief Justice Tilghman, in Stoever v. Whitman, 6 Binney, 416: "Miserable will be our condition, if property is to depend, not on the contract of the parties, expounded by established principles of law, but on what is called the custom of particular places, so that we may have different law in every town and village of the commonwealth."

"Nothing," said Chief Justice Gibson, in Bolton v. Calder & Wilson, "should be more pertinaciously resisted than these attempts to transfer the functions of the judge to the witness stand, by evidence of customs in derogation of the general law, that would involve the responsibilities of the parties in rules whose existence, perhaps, they had no reason to suspect before they came to be applied to their rights. If the existence of a law be so obscure as to be known to the constitutional expounders of it only through the evidence of witnesses, it is no ex-

travagant assumption to take for granted that the party to
be affected was ignorant at the time when the knowledge
of it would have been most material to him; and to try a
man's actions by a rule with which he had not an oppor-
tunity to become acquainted beforehand is the worst species
of tyranny."

The latter cases show that the dislike to the admissibility
of usages in general, which seems always to have charac-
terized the ablest judges in this country, is now becoming
general. "I am among those judges," says Judge STORY,
in Donnell *et al.* v. Columbia Insurance Company, 2 Sum.,
367, "who think usages among merchants should be very
sparingly adopted as rules of court by courts of justice, as
they are often founded in mere mistake, and still more
often in the want of enlarged and comprehensive views of
the full bearing of principles."

"No usage or custom," says Judge BRONSON, in Hinton
v. Locke, 5 Hill, 437, "can be set up for the purpose of con-
trolling the rules of law." Nor do courts ever admit of a
usage inconsistent with the contract; for, as Lord LYND-
HURST said in Blackett v. R. E. Insurance Company, 2 Tyr-
whitt, 266, "Usage may be admissible to explain what is
doubtful, but is never admissible to contradict what is
plain."

IV. But we go further, and say that the usage ought to
have had no effect and did not justify, because, first, it is un-
reasonable and against policy of the law. A usage will not
be recognized in a court of law unless it be reasonable, and
adapted to increase trade and promote fair dealing between
parties. (Macy v. Insurance Company, 9 Met., 363.;
Bowen v. Stoddard, 10 Met., 381; Frith v. Barker, 2 Johns.,
327; Brown v. Jackson, 2 Wash., 24; Rapp v. Palmer, 3
Watts, 178; or by statute, *vide* Walker v. Transportation
Company, 3 Wall., 150; Eager v. Atlas Insurance Com-
pany, 14 Pick., 141.)

Such usage, if allowed as a defense, would violate the

express agreement of the parties, which was fully binding on them as specific instructions from a principal to an agent, and usage is no defense to a factor or agent in such cases. (Stillman & Brother v. Hurd, 10 Tex., 109; Horner v. Dow, 10 Mass., 26; Randall v. Rotch, 12 Pick., 107. See specially Schooner Reeside, 2 Sum., 568, and Hinton v. Locke, 5 Hill, 437.)

An agent with instructions is bound to regard them in every point, nor can he depart from them without making himself responsible for the consequences. "He cannot defend himself by showing conformity to usage, if he has disobeyed positive instructions. If loss ensue from his disregard to his instructions, he must sustain it; if profit, he cannot retain it, but it belongs to the principal." (1 Pars. on Cont., 69, and cases cited in notes. To the same effect, Story on Cont., §§ 152, 155; Story on Agency, §§ 189, 199.)

It is believed that Rather cannot be held bound by the usage alleged.

V. As to the ratification, it "must be made with a full knowledge of all the facts and circumstances, or it will not be obligatory on the principal, although such facts or circumstances may have been innocently concealed or inadvertently misrepresented. (Story on Cont., §§ 160, 161.)

"Where the principal, upon a full knowledge of all the circumstances of the case, deliberately ratifies the acts, doings, and omissions of his agents, he will be bound," &c. (Story on Agency, § 239.)

Hamilton, J.—This was a suit brought by the appellee, in the district court of Harris county, against the firm of Vincent & Owens, of which the appellant is surviving partner, who were warehousemen and commission merchants of the city of Houston, to recover the value of thirty-two bales of cotton, which appellant had forwarded to them from the interior (Bell county) for storage and sale, and which had been lost by the burning of the warehouse in

which it was stored. There is little, if any, controversy as
to the facts of the transaction, and they are briefly, but sub-
stantially, these: The appellee, who was a merchant in Bell
county and trading in cotton, forwarded through his agent
in Hempstead, on the line of the Houston and Texas Central
railway, the thirty-two bales of cotton, with instructions to
said agent to forward it by the railroad to Vincent & Owens,
in Houston, for storage and sale; that the agent in Hemp-
stead, in obedience to his instructions, forwarded the cot-
ton, taking from the railroad company a bill of lading for
its delivery to Vincent & Owens, in Houston, but that, by
some mistake or negligence of the railroad company, it was
placed on their way-bill as consigned to C. Ennis & Co.,
and delivered to them upon its arrival in Houston, about
the last of November or 1st December, 1859; that upon the
receipt of the bill of lading by Vincent & Owens, some days
thereafter, by which they were advised of its consignment
to them, they made the proper inquiry at the railroad office
and learned that it had been delivered to C. Ennis & Co.,
who, being applied to, informed them that he had stored it
in the warehouse of one Whitmarsh. Ennis & Co., recog-
nizing Vincent & Owens as the real factors and consignees,
transferred Whitmarsh's receipt to them—the cotton hav-
ing been weighed and sampled—thus giving them the proper
control of it, according to the intention of the consignor,
and thereupon Vincent & Owens forwarded to appellee a
receipt, dated at Houston, on the 5th December, 1859, ac-
knowledging the receipt of the cotton at their warehouse:
"Received at Vincent & Owens, cotton warehouse," &c.,
with the marks, numbers, and weights of the respective
bales.

The receipt was forwarded in a letter dated on the 29th
December, 1859, in which the mistake of the delivery of
the cotton to Ennis & Co. is explained, and stating further
that the cotton was still, at that time, at Whitmarsh's
warehouse, with other matter not necessary to notice.

On the morning of the 16th January, 1860, Whitmarsh's warehouse was destroyed by fire, and the cotton was lost. The case was submitted to the court below without a jury upon the pleadings and evidence, and judgment rendered for the appellee. A motion for new trial was submitted, and, being overruled, this appeal was prosecuted.

The liability of the appellant, as surviving partner of the firm of Vincent & Owens, depends upon the question of prudence, diligence, and good faith, which the law requires of factors, agents, and consignees in the transaction of such interests as may be committed to their charge. If, in anything, the firm of which he was a member was negligent, indifferent, or imprudent, as the factors and consignees of the appellee in the matter complained of, he must make good the resulting loss. If they were in no manner derelict in duty, it would be an outrage upon their rights and the law to make them responsible for a misfortune which they could not avert. The facts must determine. It would be mere affectation at this day to say more upon the subject of the contract than that it was an implied agreement on the part of Vincent & Owens to store in a safe manner and sell the thirty-two bales of cotton to the best advantage for the appellee in consideration of his paying them a fair compensation for their services. The undertaking was entered into on the part of the appellee when he forwarded the cotton.

The appellee states in his petition that he was induced to forward his cotton to Vincent & Owens because of his knowledge that they had a fire-proof warehouse, and though no witness swears directly that he, the appellee, had personal knowledge of this fact, the witness Ennis does state what is nearly equivalent to such proof. He says he knew the appellee, in the years 1859 and 1860, as an up-country merchant trading in Houston, and had sold him goods.

The fair and reasonable presumption therefore is, that

he had personal knowledge of the fact; but whether this be so or not matters not. He had, at all events, such knowledge as the whole country possessed by reason of the advertisements, testified to by the witnesses, sent forth to the country by Vincent & Owens, presenting the superior claims of their fire-proof warehouse as a secure depository for cotton. This was a perfectly legitimate mode of eliciting patronage, and was doubtless the means of securing it.

That it was so in this case may be reasonably supposed from the fact that the cotton was sent there for storage. The fact that the warehouse of Vincent & Owens was fireproof was proved by several witnesses. Having forwarded it to this firm, to be stored in their warehouse, he had a right to its storage there, unless some insuperable obstacle prevented, or valid reason be given to the contrary; and if such valid reason has not been given, the liability of his consignees for the loss is fixed. The reasons or facts pleaded in avoidance of the liability are, first, that the agent of the railroad company—the freight agent, probably—at Hempstead, placed the consignment, through negligence or inadvertence, to the name of C. Ennis & Co., to whom accordingly it was delivered when it reached Houston; that it was received by Ennis & Co., and was placed by said firm in the warehouse of Whitmarsh, where it was weighed and sampled; that some days afterwards—about twenty, as proved by Ennis—they, the consignees, having learned from some source that it had been delivered to Ennis & Co., called on them, and were informed that they had received and placed it in Whitmarsh's warehouse, where it had been weighed and sampled, and produced the warehouse receipt, which, upon being satisfied of the right of Vincent & Owens as the real consignees, was promptly placed in the hands of one of the firm by Ennis, thus transferring to them the absolute control over the cotton thenceforth. So far the defense is undeniably good and well established by proof. No blame could attach to them

for the fault of others, which they could neither foresee nor provide against. The injury, if any, to the appellee was without doubt chargeable to the railroad company; and if the consignees had failed to trace the cotton, and it had been lost, the railroad company would have been responsible for its value as common carriers.

They would have been responsible in damages for any diminution in the price or value of the cotton between the date of its misdirection into the hands of Ennis & Co., and the date of its coming into the hands or under the control of Vincent & Owens. But the moment the consignees found and took control of it, the railroad company were forever released from all responsibility for its future management and safety. It seems to me that it would be a new proposition in law, and not less strange than new, that if a common carrier make a mistake in the delivery of goods, although it should happen from sheer negligence, he shall be held responsible for their safety after they have been found and taken into the possession and control of the owner, his agent, or factor. When Vincent & Owens assumed control of the cotton by the transfer of the warehouse receipt of Whitmarsh, as the proper consignees, they stood at once between their consignor and the railway company, the responsible parties for its safety and proper disposition.

I cannot feel surprise that in a former suit by the appellee against the railway company for the value of the cotton they were held to be not liable. It would, I think, have been very remarkable if with the facts in this record they had been made responsible. It would have been making them liable for property which perished in the possession and under the exclusive control of the consignees of the owner, only because as carriers they had, at the point of its destination, through mistake, caused some inconvenience.

The second point of defense is that by a custom among warehousemen in Houston, when by mistake cotton or

other produce is placed in a warehouse other than the particular house to which it is consigned, the property is allowed to remain in the house to which it is mis-sent. The only reason assigned for this usage or custom is, that to remove it would entail additional charges upon the consignor, which is undoubtedly true. But, being true, does it in all instances, or in any instance, furnish an excuse to the consignee, where the particular house in which the consignor desires his property stored is made known? There may be many reasons influencing a consignor in the choice of a house, and among them certainly the consideration of safety of his property is paramount to all others.

Who can deny the proposition that every one having produce to ship to the city of Houston has an undoubted legal right to select the house in which his property is to be stored? And where the selection has been made with reference to safety, as it is fair to presume was one of the considerations in this case, it would be a perversion of both reason and law to allow a mere custom or habit of warehousemen and factors, unknown to the people or courts of the country, to defeat the prudent foresight of the consignor, in obedience to a custom founded entirely on mistake, and thus cause the destruction of his property, without responsibility anywhere. The custom may be a matter of convenience to factors and warehousemen, as testified to by the witness Taylor, as well as for saving expenses to the consignor; but, if so, is it to be tolerated in such a case as this? Vincent & Owens had invited, by advertisements in the newspapers as factors and warehousemen, particularly calling the public attention to the fact that their house was fire-proof. The appellee forwarded to them his cotton, in the just expectation that it would be placed in their fire-proof building, and although it was not their fault that it was placed in another and less secure building in the first instance, it was their fault that it was not transferred to their own immediately after it came into their possession

and under their control.   Charged as they then were with its safekeeping, by the use of the best means in their power, which was to transfer it to their own fire-proof building, and which their implied undertaking required, they seek to avoid responsibility by taking shelter under this custom, based, they say, upon a desire to save expenses to the owner.   But in this case what were the expenses that had accrued upon the cotton up to the moment it went into their possession or under their control compared with the risk of leaving it in an insecure position?   Twenty dollars would cover the whole charges.   Storage was forty cents per bale for the first month; drayage eight cents per bale, as stated by the witnesses, making a little more than $15. The weighing and sampling would not probably amount to $5 more.

From the testimony it would seem irrational to suppose that any prudent man would have left property of the value of this cotton in a building such as the Whitmarsh warehouse was proved to have been, and in an exposed position, too, but sixty or seventy feet from an engine-station house, in which engines were fired-up every morning, rather than transfer it to a place of security at a cost of $20.   But in this case it is very clear that the railroad company were liable for the charges which had accrued upon the cotton up to the time Vincent & Owens took it, and might have been compelled to pay them, so that in fact there would have been no loss to the appellee by reason of the transfer from Whitmarsh's warehouse to that of Vincent & Owens. And is it not somewhat strange that this liability of the railroad company for charges never seems to have occurred to them, (Vincent & Owens,) when it is remembered how active they were (and which they claim in their answer as matter of merit) in aiding the appellee in bringing his suit against said company for the value of the cotton which was destroyed while in their own possession?

The testimony of most of the witnesses examined upon

the point establishes the fact, that the Whitmarsh ware-house, from the character of the building itself and its proximity to an engine-station house, constantly exposed to fire, was not a safe depository for cotton. The witness Ennis said he stored cotton there for himself and others, and did not consider it dangerous, but admits that he had heard it spoken of as unsafe. The witness Macatee had heard Whitmarsh himself complain of the engine-house being so near to his warehouse, and had also heard customers speak of it. The result proves that Ennis was mistaken, and that Whitmarsh's fears were not groundless.

The building was proved to be a large wooden frame, with sheds and with many openings. Now, from these facts with regard to the character of the building, and its dangerous proximity to any engine-house, is it rational to suppose that the appellant and his deceased partner could believe the cotton of appellee was as safe in Whitmarsh's building as if in their own fire-proof building? It is impossible to believe it.

They were bound to use all due diligence and every reasonable precaution to protect it and preserve it, and, having failed in this reasonable duty, their liability is fixed beyond the power of the custom relied on to change it. The law may not control the practice, but it is quite certain that in a case like this the custom will not control the law.

The last defense relied on is, that the appellee ratified the acts of the appellant and his deceased partner in what they had done with reference to the cotton. There is but one witness called to sustain this defense, a brother of the deceased partner, Owens. He testifies that the appellee arrived in Houston the evening previous to the burning of the cotton, and called at the office of Vincent & Owens, and had a conversation with Owens upon the subject of the cotton; that Owens inquired if appellee had received his letter, and he replied that he had. Owens then informed him about the delay of the cotton at Hempstead,

---

---

and about the mistake of its delivery at Whitmarsh's, and of the trouble they had in finding it; spoke also of the value of cotton in the market, and why they had not sold, &c.; that the appellee spoke of trying to sell the cotton, and went out to make inquiries. These are the specific items or subjects of conversation detailed by the witness, in very nearly his own words. In answer to a question he further stated, that appellee " expressed himself satisfied with our transactions."

Now, considering the fact that the appellee had but that very evening arrived in Houston, and had only called to learn whether his cotton had been sold, without time for investigation as to its safety, and finding it unsold, intent upon its sale himself, for which purpose he went out after the short conversation, is it surprising that he did not demand the removal of the cotton? If he could sell it that evening there would be no occasion for its removal, even if he had been fully aware that it was unsafe. The statement of the .witness that the appellee " expressed himself satisfied with our transactions" must be taken to mean no more than an approval of the specific transactions spoken of by Owens during the conversation—the trouble they had been put to in finding his cotton, the value of the cotton in the market, and why they had not sold his, &c., &c. He admits upon cross-examination that appellee's attention was not specially called to the question of the safety of the cotton.

It was, then, only in reference to the matters specifically mentioned, according to the witness himself, that the appellee expressed himself satisfied. This is far, very far, from a ratification of the act of leaving his cotton in an unsafe warehouse, (the very thing complained of,) when it might and ought to have been in a safe one. The question was not asked nor the subject directly referred to in any way; and if it had been, and the appellee, without knowledge of the danger, had expressed himself satisfied, it would not

bind him, if Owens, knowing the fact, failed to communicate it.

The conversation as stated by the witness falls very far short of such a ratification as the law requires. "It must be made" says Mr. Story, "with a full knowledge of all the facts and circumstances, or it will not be obligatory on the principal, although such facts and circumstances may have been innocently concealed or inadvertently misrepresented." (Story on Cont., § 160.)

And in his work on Agency, the same author states the rule to be, "Where the principal, upon a full knowledge of all the circumstances of the case, deliberately ratifies the acts, doings, or omissions of his agents, he will be bound." (Story on Agency, § 239.)

It is too clear for further argument that these well-established rules of the law have not been met and complied with in this case.

The judgment of the court below is

AFFIRMED.