**A.B.F. FREIGHT SYSTEMS, INC., Appellant,**

v.

**AUSTRIAN IMPORT SERVICE, INC., Appellee.**

No. 05–89–01415–CV.

Court of Appeals of Texas, Dallas.

Oct. 3, 1990.

Rehearing Denied Oct. 3, 1990.

Carla M. Calabrese, Dallas, for appellant.

Thomas G. Nash, Jr., Dallas, for appellee.

Before ENOCH, C.J., and SMITH [1] and STEPHENS [2], JJ.

## ON MOTION FOR REHEARING

ENOCH, Chief Justice.

The opinion of this court issued August 2, 1990 is withdrawn. This is the opinion of the court. This is a common carrier case. Appellee, Austrian Import Service, Inc. (Austrian), as consignee, brought suit against appellant, A.B.F. Freight Systems, Inc. (A.B.F.), seeking damages arising from a misdelivery of a shipment of clutches. Trial was before the court; judgment was rendered for Austrian in the amount of $24,693.05, including prejudgment interest, and against A.B.F., with a right of recovery for the judgment amount from third party defendant, Fritz Wilkinson d/b/a International Bolt & Automotive Company (International Bolt). The trial judge filed "Findings of Fact and Conclusions of Law" pursuant to a request filed by A.B.F.

Thereafter, A.B.F. filed a "Motion for New Trial and Request for Additional and Amended Findings of Fact and Conclusions of Law," which the trial court denied. A.B.F. duly perfected its appeal. We reverse and remand.

## FACTS

Wilkinson and Gunter Stromberger began doing business together in 1983. In 1984, Stromberger organized Austrian, a supplier of imported automobile parts for imported cars. Wilkinson, d/b/a International Bolt, continued purchasing auto parts from Stromberger at Austrian. In early 1986, International Bolt ordered a large number of clutches from Austrian. Austrian ordered the clutches from Daiken Clutch (Daiken) in two separate orders, resulting in two separate shipments.

### The First Shipment

The first shipment of clutches was shipped from Daiken to Austrian by A.B.F. at the end of February 1986.[3] There is no dispute between the parties as to the first shipment. When the first shipment arrived in Dallas, Stromberger's wife, who was an officer and employee at Austrian, authorized a drop shipment[4] of the clutches to International Bolt located on Switzer Avenue, even though the delivery receipt instructed A.B.F. to deliver the clutches to Austrian at its Manana address. Wilkinson also indicated in his deposition that he called A.B.F. and redirected the first shipment of clutches to International Bolt's address on Switzer Avenue, representing to A.B.F. that this was Austrian's new address.

---

[1]. The Honorable Earl W. Smith, Justice, retired, Court of Appeals, Third District of Texas at Austin, sitting by assignment.

[2]. The Honorable Bill J. Stephens, Justice, retired, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

[3]. The first shipment, although a single order, involves two shipments of clutches since Daiken could not fill the complete order out of its Michigan warehouse. Daiken shipped the bulk of the order from its Michigan warehouse on February 27, 1986, having substituted the remaining clutches from its California warehouse, which had been shipped on February 18, 1986. Austrian received the delivery of California clutches, and then turned them over to International Bolt. Thereafter, Austrian authorized A.B.F. to deliver the Michigan shipment of clutches directly to International Bolt.

[4]. A drop shipment delivery is defined as a shipment of goods directly from the manufacturer to a dealer or consumer rather than first to a wholesaler, though a wholesaler still earns profit because he took the order for the goods. BLACK'S LAW DICTIONARY 446 (5th ed. 1979).

### The Second Shipment

The second shipment, which is the source of the parties' dispute, was shipped from Daiken to Austrian by A.B.F. on March 26, 1986. A.B.F. attempted to deliver the second shipment of clutches to Austrian at its Manana address on April 1, 1986, as authorized in the delivery receipt. However, because there was no one from Austrian at the address to accept the delivery, A.B.F.'s driver was unable to deliver the second shipment of clutches. The driver returned to A.B.F. with the clutches and unloaded them at the A.B.F. dock. He signed the delivery receipt and gave it to an A.B.F. dispatcher who was on duty at the time. The word "CALL" is written on the delivery receipt and Austrian's telephone number is noted in the upper left-hand corner of the delivery receipt, indicating that A.B.F. should call Austrian for further instructions regarding this shipment. The word "CALL" on the delivery receipt, however, is scratched out. The next day, on April 2, 1986, A.B.F. loaded the clutches onto a truck and delivered them to International Bolt on Switzer Street.

Marvin Miller, Branch Manager of A.B.F., said that when a driver is unable to deliver the goods, an A.B.F. dispatcher calls the consignee to obtain instructions for redelivery. Miller said that this is the usual and customary procedure followed by A.B.F. and that, according to normal and customary procedures of A.B.F., "[w]e wouldn't scratch the word 'call' out of there unless we get in touch with somebody at that phone number and they gave us some instructions in reference to the delivery." Miller then said that A.B.F. received instructions to deliver the second shipment to International Bolt on Switzer Street, alleging that the instructions came from Austrian because "[t]hat's the only phone number on this bill." Miller, however, was unable to identify the individual at Austrian whom he claims authorized the reconsignment of the clutches to International Bolt, or that person's authority at Austrian. His testimony as to the second shipment of clutches was based upon the delivery receipt notations and A.B.F.'s usual and customary procedures.

Stromberger testified that he did not authorize delivery of the second shipment to Wilkinson and that he did not instruct anyone else to do so, noting that Wilkinson was behind on his payments for the first shipment. Although Stromberger was in Europe when the second delivery arrived in Dallas, he said that he left instructions at Austrian to call up an additional warehouseman to unload the second shipment when it arrived. Stromberger's wife, who was handling matters at Austrian in her husband's absence, also said that she did not authorize delivery of the second shipment to Wilkinson. She said that she was never contacted by A.B.F. regarding the second shipment. Moreover, Wilkinson's deposition reveals that he contacted A.B.F. with regard to the first shipment, but not the second shipment of clutches.

Stromberger returned from Europe sometime in May 1986 and called A.B.F. to inquire into the whereabouts of the second shipment of clutches. During this telephone conversation, Stromberger learned that A.B.F. delivered the second shipment of clutches to International Bolt. Austrian, however, failed to inform A.B.F. of the misdelivery at this time. Instead, Austrian notified A.B.F. of the misdelivery by letter dated December 1, 1986, some seven months after receiving notice of the misdelivery, but within nine months of the delivery date.

After the telephone call to A.B.F., Stromberger inquired at International Bolt about the second shipment. He said that he demanded a return of the shipment from Wilkinson, and that, when Wilkinson refused to return the clutches, Stromberger sought advice from his attorney. Stromberger stated that International Bolt had become delinquent in its payments for the clutches, and as a result, he was becoming delinquent in his payments to Daiken. Stromberger repossessed $22,605.25 worth of clutches from International Bolt on October 2, 1986, and sent them back to Daiken. Daiken then informed Austrian by letter dated November 5, 1986, that it was to receive a credit in an amount of $9,648.94 for the returned clutches. The terms of

the credit included a forty percent (40%) restocking fee plus freight charges. Once Austrian learned the full extent of the loss, it informed A.B.F. that the second shipment had been misdelivered, and then filed this suit.

### RATIFICATION/ESTOPPEL/WAIVER

In its fourth point of error, A.B.F. alleges that the trial court erred, as a matter of law, by failing to find that Austrian ratified the delivery of the second shipment of clutches to International Bolt. In its fifth point of error, A.B.F. alleges that the trial court erred because, as a matter of law, Austrian was estopped from claiming that A.B.F. misdelivered the second shipment of clutches. In its sixth point of error, A.B.F. alleges that the trial court erred because, as a matter of law, Austrian waived its right to complain to A.B.F. or to sue A.B.F. about the misdelivery. A.B.F. bases its allegations on the fact that Austrian waited some seven months after it learned of the misdelivery to notify A.B.F.

■■■ A party may ratify a transaction by silence or acquiescence when there is a duty to speak. *Almar–York Co. v. Fort Worth Nat'l Bank*, 374 S.W.2d 940, 942 (Tex.Civ.App.—Fort Worth 1964, writ ref'd n.r.e.); *Continental Assurance Co. v. Supreme Constr. Corp.*, 375 F.2d 378, 383 (5th Cir.1967) (applying Texas law). Where ratification is relied upon to establish a principal's liability for the unauthorized act of his agent, the burden of proof is on the party who asserts ratification. *BancTEXAS Allen Parkway v. Allied Am. Bank*, 694 S.W.2d 179, 181 (Tex.App.—Houston [14th Dist.] 1985, no writ).

■■■ Waiver is the "intentional relinquishment of a known right or intentional conduct inconsistent with claiming it." *Massachusetts Bonding & Ins. Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396, 401 (Tex.1967); *Wells Fargo Business Credit v. Ben Kozloff, Inc.*, 695 F.2d 940, 947 (5th Cir.) (applying Texas law), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). Waiver can be implied where a party's clear and unequivocal acts infer an intent to relinquish a right and the opposing party has been misled to his prejudice. *See Wells Fargo*, 695 F.2d at 947.

■■■ The principle of estoppel by silence is applied where a person, who by force of circumstances has a duty to speak, refrains from doing so thereby causing another party to believe in the existence of a state of facts, and that other party relies thereon to its prejudice. *A.R. Clark Inv. Co. v. Green*, 375 S.W.2d 425, 435 (Tex.1964).

### Interstate Commerce Act

■■■ State statutes regulating carriers are limited to matters affecting transportation within the state and do not apply to interstate traffic. *Nation v. San Antonio S. Ry.*, 115 Tex. 431, 437, 283 S.W. 157, 159 (Tex.Comm'n App.1926, opinion adopted). Under the power of the federal government to regulate interstate commerce, carriers engaged in interstate commerce are subject to regulation and control by Congress. *Houston, E. & W. Texas Ry. v. United States*, 234 U.S. 342, 351, 34 S.Ct. 833, 836, 58 L.Ed. 1341 (1914). In this case, the second shipment of clutches involved interstate travel from Michigan to Texas. Therefore, the federal statutes control, and A.B.F. may be held liable for damages under provisions of the Interstate Commerce Act, which govern liability of common carriers providing interstate service or transportation. *See Walding v. Atlas Van Lines Int'l*, 632 F.Supp. 703, 705–06 (W.D. Tex.1986).

Under the Interstate Commerce Act, a motor carrier moving cargo in interstate commerce is liable for the actual loss or injury that it causes to the cargo unless the carrier properly limits its liability. *See* 49 U.S.C.A. § 11707(a) and (c) (West Pamph. Supp.1989) (recodifying, without substantive change, the Carmack Amendment to the Interstate Commerce Act, formerly 49 U.S.C. § 10730). The Interstate Commerce Act addresses limitation on actions by and against common carriers and provides that "[a] claim related to a shipment of property accrues under this section on delivery or tender of delivery by the carrier." 49 U.S. C.A. § 11706(g) (West Pamph.Supp.1989).

Moreover, the statute includes the following notice requirements:

> A carrier or freight forwarder may not provide by rule, contract, or otherwise, a period of less than 9 months for filing a claim against it under this section and a period of less than 2 years for bringing a civil action against it under this section. The period for bringing a civil action is computed from the date the carrier or freight forwarder gives a person written notice that the carrier or freight forwarder has disallowed any part of the claim specified in the notice.

49 U.S.C.A. § 11707(e) (West Pamph.Supp. 1989).

■ A.B.F. tendered delivery of the second shipment of clutches to International Bolt on April 2, 1986, and Austrian received notice of this delivery sometime in May 1986. Thereafter, by letter dated December 1, 1986, and within nine months from the date of the tendered delivery, Austrian filed its claim against A.B.F. for misdelivery.[5] We note that laws in force at the time and place of the making of a contract enter into and form a part of it as if they were expressly incorporated in its terms, and a bill of lading is a contract within this rule. *Northern Pac. Ry. v. Wall,* 241 U.S. 87, 91–92, 36 S.Ct. 493, 495–496, 60 L.Ed. 905 (1916). Under the federal statute, Austrian clearly had a period of nine months in which to file a claim against A.B.F. for wrongful delivery. Since Austrian's legal duty to speak is defined by statute, Austrian's notice to A.B.F. was timely, and A.B.F.'s argument that it justifiably relied to its detriment upon Austrian's silence during this period is without merit. We hold that Austrian's claim against A.B.F. is not barred by the doctrines of ratification by silence, waiver, or estoppel as a matter of law. Points of error five and six are overruled.

■ Referring to its fourth point of error, A.B.F. further alleges that the trial court erred because, as a matter of law, Austrian ratified the misdelivery when it attempted to collect the value of the second shipment of clutches from International Bolt. A.B.F. alleges that ratification is established in Austrian's first amended petition by an admission that Austrian demanded payment from International Bolt for the misdelivered clutches. The petition alleges that "Wilkinson has refused to pay for the misdelivered merchandise." The petition further alleges:

> The amount due from Wilkinson on merchandise sold to him and merchandise misdelivered to him by A.B.F. Freight is $38,080.64. Plaintiff has previously made demand upon the Defendant Wilkinson for payment of said sums and no amount has been paid on the balance due.

A consignee may ratify a delivery of goods made to a third party. *See American Ry. Express v. Patterson Produce Co.,* 12 S.W.2d 158, 159 (Tex.Comm'n App.1929, judgm't adopted). One factor in determining whether a consignee ratified delivery made to a third party includes attempts by the consignee to collect the value of the goods from the third party. *See Patterson,* 12 S.W.2d at 159.

In *Patterson,* the consignee, Patterson Produce Company, had contracted to sell one car of turkeys to Conron at twenty-nine cents per pound. Patterson intended to sell a second car of turkeys in New York, through DeWinter & Stewart, who was engaged in that business. The market price of turkeys in New York at that time was several cents above twenty-nine cents per pound. However, the carrier, American Railway Company, delivered both cars of turkeys to Conron. Upon being advised of the misdelivery, Patterson notified American and requested a delivery correction. American agreed to make the correction as requested, but failed to do so. Patterson initially drew a draft upon DeWinter & Stewart for the turkeys and forwarded it

---

5. Since notice to A.B.F. by Austrian was within nine months of the date of misdelivery, we need not address whether the definition of "accrue" in subsection 11706(g) is subject to the equitable tolling doctrine. *Aluminum Co. v. United States,* 867 F.2d 1448, 1452 (D.C.Cir.1989); *Atchison, Topeka & Santa Fe Ry. v. Interstate Commerce Comm'n,* 851 F.2d 1432, 1438–39 (D.C.Cir. 1988).

for collection through a bank. DeWinter & Stewart, having failed to receive the turkeys, dishonored the draft and suggested that Patterson present the draft to Conron. Patterson thereafter presented Conron with a draft for the second car of turkeys at the rate of twenty-nine cents per pound. Conron accepted the second car of turkeys and honored the draft which was accepted by Patterson. Patterson then attempted to recover from American the difference between what would have been realized by the sale of the turkeys at the market price and the amount received from Conron. Patterson testified, without dispute, that in dealing with Conron, his intention was to minimize the damages resulting from the unauthorized delivery and not to discharge American's liability for such damages. The court held that the facts conclusively established a ratification and that the legal effect of Patterson's acts could not be affected by his secret intention in doing them. *Patterson*, 12 S.W.2d at 159.

The facts in this case are distinguishable. The undisputed facts in *Patterson* show that Patterson received payment in full for the contract amount as negotiated between the buyer and seller *after* the misdelivery occurred. Stromberger, on the other hand, neither negotiated a new agreement with nor received any payment from International Bolt for the second shipment of clutches. We disagree with A.B.F.'s contention that Stromberger ratified the misdelivery merely by demanding payment from International Bolt for the second shipment of clutches. The burden of proof is on A.B.F. to prove ratification. *BancTEXAS*, 694 S.W.2d at 181. A.B.F. failed in that burden. A.B.F.'s fourth point of error is overruled.

## NEGLIGENCE

In points of error one and two, A.B.F. alleges that the trial court erred, as a matter of law, because Austrian failed to establish negligence and prove the elements of its case. A.B.F. also alleges that the trial court erred, as a matter of law, by awarding Austrian damages in an amount of $18,640 because there is no evidence upon which to base such an award.

When reviewing a no evidence challenge, an appellate court must consider the evidence and reasonable inferences drawn therefrom which, when viewed in their most favorable light, support the jury verdict or court finding. The court must disregard all evidence and inferences to the contrary of the fact finding. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987); *Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 593 (Tex.1986). If there is more than a scintilla of evidence to support the finding, the challenge fails. *Stafford*, 726 S.W.2d at 16. The initial review of a matter of law point is the same as that required for a no evidence point. However, in addition to finding no probative evidence to support the jury finding, the court must also find that the contrary proposition to the finding is established as a matter of law. *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex.1982).

### Duty/Breach

A.B.F. alleges that, under Texas law, Austrian was required to prove the elements of its negligence action. In this connection, it is well settled that Austrian has the burden of establishing each of the three elements of actionable negligence. The elements are a legal duty owed by one person to another, a breach of that duty, and damages proximately resulting from such breach. *See Abalos v. Oil Dev. Co.*, 544 S.W.2d 627, 631 (Tex.1976); *Gray v. Baker & Taylor Drilling Co.*, 602 S.W.2d 64, 65 (Tex.Civ.App.—Amarillo 1980, writ ref'd n.r.e.).

Proof of delivery of an interstate shipment to the initial carrier, and failure to deliver the same to the consignee, raises a presumption of negligence, giving rise to liability imposed by the Carmack amendment to the Interstate Commerce Act. *Galveston, Harrisburg, & San Antonio Ry. v. Wallace*, 223 U.S. 481, 492, 32 S.Ct. 205, 207, 56 L.Ed. 516 (1912). The carrier then has the burden of proving that the loss resulted from some cause for which the carrier was not responsible in law or by contract. *Wallace*, 223 U.S. at 492, 32

S.Ct. at 207. In *Wallace*, the Court reasoned:

> The plaintiffs were not obliged both to prove their case and to disprove the existence of a defense. The carrier and its agents, having received possession of the goods, were charged with the duty of delivering them, or explaining why that had not been done. This must be so, because carriers not only have better means, but often the only means of making such proof. If the failure to deliver was due to the act of God, the public enemy, or some cause against which it might lawfully contract, it was for the carrier to bring itself within such exception. In the absence of such proof, the plaintiffs were entitled to recover, and the judgment is affirmed.

*Wallace*, 223 U.S. at 492, 32 S.Ct. at 207.

 In this case, the record contains a freight bill for the second shipment of clutches, representing the bill of lading from Daiken to Austrian, which was shipped by A.B.F. However, A.B.F. delivered the second shipment of clutches to International Bolt and not Austrian, the named consignee on the freight bill. Both Stromberger and his wife, the individuals who were in charge at Austrian, said that they did not authorize delivery of the second shipment to International Bolt. We hold that based upon the evidence, viewed in the light most favorable to the judgment, A.B.F. failed to prove the absence of negligence in delivering the second shipment of clutches.

### Proximate Cause

 A.B.F. contends that Austrian failed to prove that it suffered damages, and, if so, whether the delivery of the second shipment of clutches to International Bolt proximately caused those damages. In applying the principles discussed above

regarding a no evidence point, we review the record to determine whether there is any evidence of probative value to support the trial court's findings that Austrian suffered damages and whether A.B.F.'s misdelivery of the goods to International Bolt proximately caused Austrian's damages.

The trial court included in its findings of fact that "[t]he delivery of the said goods to International Bolt & Automotive Company resulted from the negligence of A.B.F. Freight Systems, Inc., and said negligence was the proximate cause of the loss and damages to Austrian Import Service, Inc." At the outset, Austrian claims that A.B.F. did not specifically challenge the trial court's findings of fact as to proximate cause and damages as required by rule 74(d) of the Texas Rules of Appellate Procedure; therefore, the findings are to stand as proven facts in this case. *Lovejoy v. Lillie*, 569 S.W.2d 501, 504 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e.). However, we note that A.B.F. filed with the trial court a request for additional and amended findings of fact and conclusions of law specifically challenging the findings as to proximate cause and damages.[6] We also note that, in its first two points of error on appeal, A.B.F. alleges that the trial court erred, as a matter of law, in its findings of fact on proximate cause and damages. Moreover, A.B.F.'s argument includes references to the transcript and appropriate case citations. We hold that A.B.F. has specifically challenged the trial court's findings of fact on proximate cause and damages and has properly preserved error on these issues. *See* Tex.R.App.P. 74(d). The challenged findings, therefore, are subject to review.

A.B.F. contends that Austrian offered no competent evidence to show that the misdelivery of the clutches to International Bolt

---

6. The trial court filed its "Findings of Fact and Conclusions of Law" on August 14, 1989. After a judge files original findings of fact and conclusions of law, a party may, within five days, request further additional or amended findings. Tex.R.Civ.P. 298. A.B.F. filed its "Request for Additional and Amended Findings of Fact and Conclusions of Law" on September 12, 1989, more than five days after the original findings

were filed. Austrian, however, failed to challenge the late filing, and the trial court entered an order on September 23, 1989, refusing to make such requested additional and amended findings and conclusions. By failing to challenge the late filing, Austrian has waived the complaint that A.B.F. failed to specifically challenge the court's findings of fact and conclusions of law in the trial court.

proximately caused Austrian's damages. Stromberger admitted that he purchased the clutches from Daiken at the request of International Bolt and that, at the time of the purchase, Stromberger intended to sell the clutches to International Bolt. Stromberger, however, testified that he would not have sent the second shipment of clutches to International Bolt had A.B.F. delivered them to Austrian "[b]ecause the relationship started to smell after he did not pay on his first installment." Stromberger explained that "the relationship was bad" and that "I didn't want to do business with him, I wanted out, I wanted my parts back and I wanted my money." Stromberger also said:

And it ought to be my decision who I want to extend credit to and who I want to do business with if I pay for the parts. So even if he would have been able to pay, I would not have done business with him because I don't let my customers decide to be on open account or on credit at Austrian.

An invoice from Austrian to International Bolt for the first shipment of clutches, dated February 27, 1986, in an amount of $29,927.44, included the following payment terms: International Bolt was to pay one-half of the invoice amount within fifteen days, one-fourth within forty-five days, and the remaining one-fourth within sixty days. Stromberger testified that, in accordance with the invoice, International Bolt owed Austrian about $15,000 on March 15, 1986, and no payment was made.[7] On April 2, 1986, the date A.B.F. tendered delivery of the second shipment of clutches, International Bolt was already late in its payment to Austrian for the first shipment of clutches.

Stromberger then said that, had A.B.F. delivered the second shipment of clutches to Austrian rather than International Bolt, Austrian would have been able to sell the clutches to its other customers. "We would have sold them, we were in the auto parts business, Austrian Importers and auto parts distributors." Stromberger explained that Austrian had a salesman con-tacting an established customer base of about one hundred fifty auto stores. The salesman would call the customers periodically to see what they needed from the lines carried by Austrian. Stromberger's testimony on cross examination concludes as follows:

Q. I understand, I don't have any dispute with your lawsuit, your claims against Mr. Wilkinson, but to the extent you are trying to impose those same amounts against my client, that's what I am trying to do is connect out, show some proximate causation of these damages figures that you are asserting against my client, and what I am trying to ask you is: How should you have been in any different position had those clutches been properly delivered as you allege they should have been?

A. Because I would have made the money from the sale. Austrian Import did not sell to X, Y, Z customer at a ten percent mark up, Austrian Import sold at twenty-five thousand dollars at a ten percent mark up and had completely different mark up on your small, little deals every day.

Q. So you are assuming you would have been able to sell off the fifty-thousand dollar's worth of clutches?

A. Of course. Twenty-five thousand, we're talking about.

Viewing the evidence in the light most favorable to the fact finding, we hold that there is some evidence of probative value to support the trial court's finding that A.B.F.'s misdelivery proximately caused Austrian damages. *Stafford*, 726 S.W.2d at 16. To the extent points of error one and two attack the findings on negligence and proximate cause, they are overruled.

In its third point of error, A.B.F. also attacks the finding of proximate cause and alleges that the trial court erred by failing to find that it was not responsible, as a matter of law, for the clutches once Austrian repossessed them from Wilkinson. To support its argument, A.B.F. relies upon *Vincent v. Rather*, 31 Tex. 77 (1868). *Vin-*

---

**7.** A partial payment on account was received several months later.

*cent,* however, is distinguishable. The consignee in *Vincent* took control of cotton that the carrier had misdelivered by accepting a warehouse receipt from the third party to whom the cotton had been misdelivered. The consignee failed to remove the cotton and it was destroyed in a warehouse fire. The carrier was relieved of liability. *Vincent,* 31 Tex. at 79. In the present case, Austrian's losses were incurred while the goods were under the control of International Bolt, unlike *Vincent,* where the loss was incurred while the goods were under the consignee's control. We find no merit in this point of error.

### Damages

Revisiting points of error one and two, we must now determine whether there is any evidence of probative value to support $18,640 in damages awarded to Austrian by the trial court. Although the uncertainty of damages is not fatal to recovery once the fact of damage is established, it is nevertheless a reasonable degree of certainty with which the extent of damages must be shown. *Southwest Battery Corp. v. Owen,* 131 Tex. 423, 426, 115 S.W.2d 1097, 1098 (1938); *State Nat'l Bank v. Farah Mfg. Co.,* 678 S.W.2d 661, 693 (Tex.App.—El Paso 1984, writ dism'd by agr.). There can be no recovery for damages which are speculative or conjectural. *Roberts v. U.S. Home Corp.,* 694 S.W.2d 129, 135 (Tex.App.—San Antonio 1985, no writ). The damages must be ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or direct inference from known facts. *Berry Contracting, Inc. v. Coastal States Petrochemical Co.,* 635 S.W.2d 759, 761 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

The trial court's findings of fact include the following:

The goods which were returned by International Bolt to Austrian Import Service were returned to Daiken Clutch USA. These returned goods were credited to the account of Austrian Import Service, Inc., in the amount of $9,648.94. Of the

credit allowed, $6,985.00 was attributable to the March 26, 1986 shipment.

As a result of the negligence of A.B.F. Freight Systems, Inc., Austrian Import Service, Inc., suffered a loss of $18,640.00.

Austrian Import Service, Inc., is entitled to Pre–Judgment Interest in the amount of 10% compounded daily from October 3, 1986. Said interest is in the amount of $6,053.05.

In this case, Stromberger presented evidence showing that both shipments were valued at about $25,000 each, and that International Bolt eventually paid Austrian $12,000. In plaintiff's exhibit number eight, Stromberger lists a complete inventory of goods Austrian repossessed from International Bolt on October 2, 1986. Plaintiff's exhibit number nine is a ledger sheet from Daiken, which reflects the return of the inventory identified in plaintiff's exhibit eight. Daiken valued the purchase price of the inventory returned at $22,605.25. Exhibit number eight, however, includes items from both the first and second shipments. Stromberger said that some of the goods Austrian repossessed were exclusive to the first shipment only and not to the second shipment. The items exclusive to the first shipment, which are not prejudicial to A.B.F., total $2,765.11, and are listed in plaintiff's exhibit ten. Therefore, an amount of $19,840.25 for the clutches Austrian returned to Daiken are traced to both the first and second shipments without segregation.

Austrian must prove its damages to recover against A.B.F. for misdelivery of the second shipment of clutches. Damages must be calculated with a reasonable degree of certainty. *Berry,* 635 S.W.2d at 761. Austrian received a single credit against the amounts it owed Daiken for clutches in both the first and the second shipments. Therefore, Austrian must identify the clutches it returned to Daiken from the second shipment in order to prove its damages.

Daiken credited Austrian $9,648.94 for the returned inventory after deducting a forty percent (40%) restocking fee and

freight charges. Stromberger said that, in repossessing the clutches common to both shipments, he was unable to distinguish with absolute certainty which items came from the first and second shipments. Stromberger said that there was no definite way to determine the number of clutches from shipment two because "all the numbers are the same for the same (clutch) part on shipment one and two." Stromberger attempted to make an estimate using a last in, first out calculation, since he had witnessed International Bolt stock the clutches on top of each other. Stromberger explained that International Bolt had the clutches from the first and second shipments for a total of thirty-four weeks. Stromberger allowed International Bolt two weeks to stock and price the clutches from the first shipment until actual sale of the parts. This provided International Bolt two weeks in which to sell the clutches from the first shipment prior to the arrival of the second shipment. International Bolt then had thirty-two weeks in which to sell clutches from both the first and second shipments. Using the last in, first out calculation, the clutches from the second shipment would be sold first, and thereafter the clutches from the first shipment would be sold. Based upon the total return of clutches to Daiken, Stromberger suggested that $6,701.30 would come from shipment two, and the balance would come from shipment one. We note however, that Stromberger failed to provide any objective facts in determining the number of clutches sold at any time during the thirty-four-week period. Stromberger's estimate was based solely upon his experience in handling clutches. He testified that he was not a partner with Wilkinson nor was he involved in Wilkinson's business. He also failed to produce business records reflecting International Bolt's clutch sales during this time period to support his calculations. Moreover, Stromberger testified as a fact witness, and not as an expert on damages. Therefore, we hold that the evidence concerning Austrian's damages regarding the second shipment of clutches is legally insufficient to support the award. We sustain those portions of A.B.F.'s points of error one and two complaining of legal insufficiency of the evidence to support the damages award. 

■ Having prevailed on its "no evidence" point as to damages, A.B.F. would ordinarily be entitled to rendition of judgment in its favor. *Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176, 176–77 (Tex.1986). However, a court of appeals, having found error in the judgment of the trial court on the issue of damages, possesses the power to remand because such recourse "will subserve better the ends of justice." *Zion Missionary Baptist Church v. Pearson,* 695 S.W.2d 609, 613 (Tex.App.—Dallas 1985, writ ref'd n.r.e.) (quoting *Massachusetts Mut. Life Ins. Co. v. Steves,* 472 S.W.2d 332, 333 (Tex.Civ.App.—Fort Worth 1971, no writ)). In this case, although Austrian did not prove its damages with reasonable certainty, there is evidence which shows damages generally in that Daiken applied a reduced credit to Austrian's account for the return of clutches in both the first and second shipments. Therefore, we hold that in the interests of justice, a remand is required in this cause for a determination of reasonably certain damages.

## PREJUDGMENT INTEREST

■ In points of error seven and eight, A.B.F. alleges that the trial court erred, as a matter of law, in awarding prejudgment interest from October 3, 1986, until the date of judgment, at a rate of ten percent compounded daily rather than at ten percent simple interest from 180 days after A.B.F. was notified of the judgment. A.B.F. bases its arguments upon the following sections of a Texas statute.

> The rate of prejudgment interest shall be the same as the rate of postjudgment interest at the time of judgment and shall be computed as simple interest.

TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 6(g) (Vernon Supp.1990).

> [P]rejudgment interest accrues on the amount of the judgment during the period beginning the 180th day after the date the defendant receives written notice of a claim or on the day the suit is filed, whichever occurs first, and ending on the

day preceding the day judgment is rendered.

TEX.REV.CIV.STAT.ANN. art. 5069-1.05, § 6(a) (Vernon Supp.1990).

However, this statute did not become effective until September 2, 1987. The enacting legislation for the latter statute limits its application to:

(1) an action commenced on or after the effective date of this Act; or

(2) a new trial or retrial following appeal of the trial court's judgment in an action commenced before the effective date of this Act.

Act of June 16, 1987, 70th Leg., 1st C.S., ch. 3, § 3(a), 1987 TEX.GEN.LAWS 51, 52.

This case was filed June 24, 1987, and is, thus, not governed by the above Texas statutes but instead by the law in effect on that date. This rule, as stated by the Texas Supreme Court, is: "[A] prevailing plaintiff may recover prejudgment interest compounded daily (based on a 365-day year) on damages that have accrued by the time of judgment.... Prejudgment interest shall accrue at the prevailing rate that exists on the date judgment is rendered...." *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 554 (Tex.1985) (emphasis omitted). *Cavnar* further explains that the prevailing rate is that rate set by the consumer credit commissioner as provided in article 5069-1.05, § 6(a) of the Texas Revised Civil Statutes. *Cavnar*, 696 S.W.2d at 554. On the date the damage was sustained, October 3, 1986, the prevailing rate was ten percent. Office of Consumer Credit Commissioner, 11 Tex.Reg. 4316 (October 17, 1986) (Notice of Rate Ceilings). A.B.F.'s seventh and eighth points of error are overruled.[8]

### DISPOSITION

Generally, when an error affects part of a matter in controversy which is severable without unfairness to the parties, this Court shall reverse the judgment and remand for a new trial as to only that part affected by such error. *Mader v. Aetna*

*Casualty & Sur. Co.*, 683 S.W.2d 731, 735 (Tex.App.—Corpus Christi 1984, no writ); TEX.R.APP.P. 81(b)(1). However, a separate trial on unliquidated damages alone shall not be ordered if liability issues are contested. TEX.R.APP.P. 81(b)(1). Accordingly, we reverse the judgment of the trial court, and we remand the entire cause for a new trial in accordance with this opinion.

---

**8.** Our ruling is limited to this stage of the appeal; we are cognizant that upon retrial this case *will* be governed by the Texas statutes, as provided in the enacting legislation of article 5069-1.05, § 6 of the Texas Revised Civil Statutes.