Opinion issued February 28, 2008









     





In The
Court of Appeals
For The
First District of Texas




NO. 01–05–00940–CV




SCOTT BADER, INC., AMY C. WRIGHT, KERN & WOOLEY, L.L.P.,
AND NATIONAL PIGMENTS & CHEMICALS, INC., Appellants

V.

SANDSTONE PRODUCTS, INC., Appellee




On Appeal from the 127th District Court
Harris County, Texas
Trial Court Cause No. 2000–27864A




* * *




NO. 01–06–00593–CV




SCOTT BADER, INC. AND NATIONAL PIGMENTS & CHEMICALS,
INC., Appellants

V.

SANDSTONE PRODUCTS, INC., Appellee




On Appeal from the 127th District Court 
Harris County, Texas
Trial Court Cause No. 2000–27864




O P I N I O N

          These two appeals arise from a product liability suit brought by appellee,
Sandstone Products, Inc. (“Sandstone”), against appellants, Scott Bader, Inc. (“Scott 
Bader”) and National Pigments & Chemicals, Inc.


 In appellate cause number
01–05–00940–CV, Scott Bader and its trial counsel, Amy C. Wright, and Wright’s
law firm, Kern & Wooley, L.L.P., appeal sanctions assessed against them. The trial
court awarded sanctions against Scott Bader for abusing the discovery process and
against Wright and her firm for violating an in limine order during trial. Scott Bader
contends that it did not abuse the discovery process and that the sanctions were not
otherwise “just.” Wright and her firm challenge the sanctions award against them by
asserting that the sanctions were excessive.



          In appellate cause number 01–06–00593–CV, Scott Bader and National
Pigments challenge the trial court’s judgment rendered against them in favor of
Sandstone. Presenting four issues and numerous sub-issues, Scott Bader contends
that (1) the testimony of Sandstone’s causation expert was unreliable and constituted
no evidence of causation, (2) the evidence was legally insufficient to support the
damages awarded by the jury, (3) the trial court erred when it included a “binding
instruction” in the jury charge that Scott Bader had breached its contract and breached
its warranty with Sandstone, and (4) alternatively, the trial court’s judgment should
be modified because it awarded prejudgment interest on future damages. 
          In appellate cause number 01–05–00940–CV, we affirm, in part, and reverse
and remand, in part. In appellate cause number 01–06–00593–CV, we reverse the
judgment and remand. 
 
Factual and Procedural Background
          Scott Bader is a United States company and a wholly-owned subsidiary of a
British company. Scott Bader sells a resin, known as Texigel, which is used as a
component ingredient in roof coatings. Although its British parent company
manufactures the resins it sells, Scott Bader does not manufacture Texigel, rather, it
contracts with “toll” or sub-manufacturers to make the product. Goodrich
Corporation (“Goodrich”) was Scott Bader’s toll manufacturer until 1999. At that
point, Para-Chem Southern, Inc. (“Para-Chem”) began to manufacturer Texigel for
Scott Bader. 
          Sandstone manufactures and sells roof sealant coatings. From 1994 until 2002,
Sandstone purchased Texigel from Scott Bader to use in manufacturing its roof
coating.


 Texigel was the component ingredient in Sandstone’s roof coating that
caused the roof coating to “bind” or adhere to roofs. Scott Bader provided a formula
to Sandstone instructing it how to mix Texigel with nine other ingredients to make
Sandstone’s roof coating. 
          In 1999, Sandstone began receiving customer complaints that its roof coating
was failing. Specifically, Sandstone’s roof coating was swelling with water and not 
adhering to the roofs to which it had been applied. Sandstone contacted Scott Bader
about the problems. Initially, Scott Bader attributed the problems to improper
application of the roof coating. As more complaints arose, Scott Bader worked with
Sandstone to modify the formula used to make Sandstone’s roof coating. The
modified formulas continued to include varying amounts of Texigel. Despite the
modifications, Sandstone’s roof coating continued to fail. Sandstone worked with its
customers by supplying new roof coating materials and, in some instances, labor. 
However, the roof coatings continued to fail.
          During the same time frame, Sandstone sought to meet an industry standard for
roof coatings. The State of Florida required roof coatings to meet this standard. As
a result, Sandstone could not sell its product in Florida until its coating passed the
industry-standard test (referred to as the “Dade County Test”). Sandstone submitted
its roof coating for testing on three separate occasions, but its product never passed
the test. On each occasion, Sandstone’s product failed the Dade County Test’s “water
swell” requirements.
          Sandstone ultimately attributed the failure of its roof coating to Texigel. Scott
Bader denied that claim, contending that Sandstone was mixing the roof coating
improperly. Sandstone sued Scott Bader asserting claims for breach of contract,
breach of warranty, violations of the Texas Deceptive Trade Practices Act (“DTPA”),
fraud, and negligent misrepresentation. Sandstone also sued NPCI, Para-Chem, and
Goodrich. 
          During the course of the litigation, Sandstone alleged that Scott Bader had
made a number of misrepresentations: 
•        Scott Bader misrepresented that Texigel was water resistant and could be used
as an adhesive in roof coatings. It is undisputed that Texigel is a styrene
acrylic resin not a pure acrylic resin. Styrene acrylic contains the compound
acrylamide, a water absorbent material, not a water resistant material. As
such, Sandstone contended that Texigel was unsuitable for use in commercial
roof sealant coatings, such as those manufactured by Sandstone. 
 
•        Scott Bader misrepresented that it manufactured Texigel, when in fact it was
manufactured by toll manufactures Goodrich and Para-Chem.
 
•        Scott Bader misrepresented that Texigel could be used to pass the Dade County
Test. Sandstone contended that an acrylamide resin could never pass the test;
rather, only pure acrylic resins can meet the standard.
 
•        Scott Bader misrepresented that Texigel contained the same ingredients as the
resin manufactured by Scott Bader’s British parent company, when, in fact, the
resin manufactured by Scott Bader’s parent company contained pure acrylic,
while Texigel was made from acrylamide.
•        Scott Bader misrepresented that Sandstone was the only customer to complain
about roofing problems associated with Scott Bader’s products. Sandstone
contended that Scott Bader had received other customer complaints.
 
          Sandstone also alleged that Scott Bader was aware that Texigel deviated from
its product specifications; that is, it was aware that Goodrich, its toll manufacturer,
had at some point deviated from the resin formula of Scott Bader’s parent company
and had started using styrene acrylic instead of pure acrylic to make Texigel. 
Sandstone alleged that Scott Bader was also aware that quality control issues
persisted with Texigel, even after Scott Bader contracted with a new toll
manufacturer, Para-Chem. Sandstone asserted that, despite Scott Bader’s awareness
of these problems and its awareness of Sandstone’s customer complaints, Scott Bader
never disclosed this information to Sandstone.
          During the course of the litigation, a discovery dispute arose between the
parties. Sandstone filed two separate motions to compel production of information
and documentation regarding product specification and testing, other customer
complaints received by Scott Bader, and the identity of the current or former Scott
Bader employee most knowledgeable regarding product development and formulation
issues. 
          In its response to Sandstone’s second motion to compel, Scott Bader
represented that it had produced all testing documents and that it had no customer
complaints, other than those of Sandstone. Scott Bader also represented that it had
never been involved in the mixing or formulation of Texigel, rather it was a supplier
and seller of the product. Scott Bader’s counsel also informed Sandstone that the
person with the most knowledge regarding product formulation was not a Scott Bader
employee but was a person who resided in the United Kingdom. Scott Bader did not
reveal the identity of the person. 
          From May 2004 until March 2005, Scott Bader produced approximately 200
pages of documents to Sandstone in response to Sandstone’s discovery requests. On
March 1, 2005, Scott Bader produced 8,000 pages of documents to Sandstone. 
Before the production of these documents, Scott Bader had filed two no-evidence
motions for summary judgment against Sandstone. Also at this point, Sandstone had
already taken numerous depositions.
          On August 15, 2005, which was shortly before trial, Sandstone filed its “Trial
Brief in Support of Sanction, Spoliation Instruction, and/or Continuance.” The
principal basis for the motion was a document produced for the first time by Scott
Bader on March 1, 2005 as part of the 8,000-page document production. The
document was a memorandum authored by Scott Bader employee, David Boothe. 
The Boothe memorandum was the first page of a 17-page document that had
previously been produced sans the memorandum. 
          The Boothe memorandum was written on November 9, 2000 and identifies
concerns associated with Scott Bader’s transition from toll manufacturer Goodrich
to toll manufacturer Para-Chem. The Boothe memorandum stated that Texigel was
manufactured by Goodrich until August of 1999 and that Scott Bader “changed to
Para-Chem at that time to start a closer relationship with the [Para-Chem] folks and
to increase our margins” on Texigel. The Boothe memorandum revealed that, at the
time of the transition, Scott Bader was without a president and that Terry Strickland
(an employee of Scott Bader’s British parent company) was the “main lead” on the
transition from Goodrich to Para-Chem. The Boothe memorandum stated that “our
singular pursuit should be to handle viscosity drift and stability issue.” The
memorandum acknowledges that the “USA formulation” for Texigel differs from the
“UK version” because the “US version contains acrylamide, where the UK version
does not.” 
          The memorandum notes that the “UK people” handled the transfer from
Goodrich to Para-Chem and continues, 
There was no control material sent at the time. The lab material was
made and reviewed in the UK and approvals were sent from the UK. 
Once we changed to [Para-Chem], we never went back to [Goodrich]. 
It is now Nov. 2000 and we are reviewing the scale up performed at
[Para-Chem] because we believe we have a slightly different product
due to viscosity drifts and also extra tackiness (as reported from our
customers).
          Sandstone contended that the Boothe memorandum was a “smoking gun”
document because it refuted many of the previous representations made by Scott
Bader during the discovery process. Specifically, Sandstone asserted that the Boothe
memorandum refuted the following earlier representations made by Scott Bader
during discovery:
•        No personnel from Scott Bader’s parent company in the United Kingdom were
involved in the control of Scott Bader; 
 
•        Scott Bader had no corporate representatives knowledgeable about the
formulation and testing of Texigel;
 
•        No changes had been made to Texigel since 1995, other than changing toll
manufacturers; and
 
•        Scott Bader had no other customer complaints regarding Texigel, aside from
those of Sandstone.
          In addition, Scott Bader produced documents revealing that, at one point,
Strickland had been Scott Bader’s director. Sandstone contended that this was
relevant because it further highlighted the importance of Strickland’s role in the
production of Texigel. Sandstone alleged that Scott Bader should have identified
Strickland as the corporate representative with the most knowledge of formulation
and testing for deposition purposes.
          Scott Bader also produced customer invoices from which the customer names
and addresses had been redacted by hand. Sandstone asserted that Scott Bader had
redacted the information to prevent Sandstone from identifying other customers that
may have experienced similar problems with Texigel, as referenced in the Boothe
memorandum. Sandstone also pointed out that it had discovered that another Scott
Bader customer, Sealoflex, had complained to Scott Bader about a roofing issue. 
Scott Bader did not produce the documents related to the Sealoflex complaint; rather,
Sandstone had obtained the documents by subpoena directly from Sealoflex.           The trial court granted Sandstone’s request for sanctions following a hearing. 
In its sanctions order signed on August 22, 2005, the trial made the following
findings of fact:
a.The Court finds that Defendant SCOTT BADER has knowingly
and in flagrant bad faith engaged in discovery abuse, including
the following:
 
(i)withholding critical responsive documents until the
production of more than 8,000 pages of documents
on March 1, 2005, after the depositions in the
lawsuit had already taken place of witnesses set in
this order [the trial court later identified the
depositions of eight witnesses].
 
(ii)producing documents in a manner calculated to
conceal information (through removing the key first
page of a document and marking out information in
other documents), with conflicting and inadequate
explanations for the same that lack credibility; 
 
(iii)presenting deposition witnesses with such critical
documents and information concealed or not
produced; 
 
(iv)failing to name Terry Strickland as a witness with
knowledge of relevant facts, or to produce
responsive documents, related to Strickland’s role as
director of Defendant SCOTT BADER, his role as
the “main lead” in Defendant SCOTT BADER’s
transition from using Co-Defendant Goodrich[’s]
services to those of Co-Defendant Para-Chem, his
direct supervision over specific issues regarding the
formulation and testing of Defendant’s product, and
his direct involvement in specific issues related to
customer reports of problems.
 
(v)failing to produce as a corporate representative a
witness with knowledge as requested; and 
 
(vi)filing two no-evidence motions for summary
judgment motions on December 10, 2004 and
February 23, 2005, respectively, when Defendant
SCOTT BADER and its counsel knew that the
production of documents and witnesses was
deficient.
 
b.In particular, [the] Court finds that Defendant SCOTT BADER’s
actions were calculated to conceal evidence that would indicate 
 
(i)that SCOTT BADER’s product did not meet its
stated specifications; and 
 
(ii)that the stated specifications were modified.
 
c.The Court further finds that Defendant SCOTT BADER’s actions
and representations to the Court throughout the pretrial discovery
indicate a pattern or history of bad faith discovery abuse,
demonstrate callous disregard for the responsibilities of discovery
under the rules, and significantly interfere with the integrity and
core judicial functions of this Court and its rulings;
 
d.For all of the reasons of [sic] above, the Court finds that
Defendant SCOTT BADER prejudiced Plaintiff SANDSTONE’s
ability to present its case.
          The trial court’s sanctions order further provides, 
The sanctions order below is directly related to the offensive conduct,
and is appropriate and necessary because a lesser sanction will not
promote compliance. The Court has considered the possibility of all
lesser available options. Under these circumstances, however, there is
no lesser sanctions available to address and deter Defendant SCOTT
BADER’s conduct while preserving SANDSTONE’s rights.
          The trial court awarded the following sanctions to Sandstone:
Plaintiff has requested and shall be entitled to the following jury
instruction, which shall be treated as a partial default judgment limiting
issues in dispute as Defendant Scott Bader, Inc. and its indemnified co-defendant’s pleadings [are] struck to this extent:
 
“You are to presume (1) that the product that was shipped
between mid-1999 and 2001 did not meet the specifications
Scott Bader provided to Sandstone, and (2) that the
specifications that Scott Bader provided to Sandstone for
the product during mid-1999 and 2001 were modified.”
 
Defendant SCOTT BADER and the party it indemnifies [NPCI] shall
not be permitted to rebut the factual presumptions above and any
affirmative defenses addressed to this issue shall be stricken.
          The trial court also ruled that Scott Bader could not use Terry Strickland as a
witness at trial and ordered that Scott Bader “may not use the deposition testimony
of any witness from a deposition unless SCOTT BADER first demonstrates to the
Court that such deposition was taken after full production of documents.” The trial
court then identified eight witnesses that were deposed before Scott Bader’s
“production of critical documents on March 1, 2005.” 
          The trial court further ordered that Scott Bader pay $68,000 in sanctions for
attorney’s fees and expenses incurred by Sandstone attributable to Scott Bader’s
discovery abuse. The trial court also set aside earlier rulings on summary judgments
and struck motions for summary judgment filed after March 1, 2005. Lastly, the court
granted Goodrich’s and Para-Chem’s request that Sandstone’s claims against them
be tried separately.
          Shortly after the court signed the sanctions order, the case proceeded to trial
against Scott Bader. On August 30, 2005, the third day of trial, Scott Bader’s lead
trial counsel, Amy Wright, violated an in limine order when she “intentionally
injected liability insurance of [Sandstone] into the evidence presented in front of the
jury.” For this conduct, the trial granted Sandstone’s request for mistrial and
sanctioned Wright and her law firm, Kern & Wooley, $79,012.40, representing
Sandstone’s “reasonable and necessary fees and expenses” from voir dire through the
hearing on the motion for sanctions. 
          The trial court signed an order severing this order and the earlier sanctions
order for discovery abuse from the remainder of the case. The trial court also signed
a final judgment in the severed cause incorporating the sanction orders, thereby
making the sanction orders final and appealable. 
                                         THE SANCTIONS APPEAL 
          In their third issue, appellants challenge the sanctions awarded against them.
Scott Bader challenges the sanctions for discovery abuse. Wright and her law firm
challenge the sanctions for Wright’s violation of the in limine order.
A.      Discovery Abuse Sanctions
          1.       Standard of Review and Governing Principles
          We review a trial court’s ruling on a motion for sanctions under an abuse of
discretion standard. Cire v. Cummings, 134 S.W.3d 835, 838 (Tex. 2004). A trial
court abuses its discretion when its ruling is arbitrary and unreasonable without
reference to any guiding rules and principles. Id. at 838–39. In conducting our
review, we are not limited to a review of the “sufficiency of the evidence” to support
the trial court’s findings; rather, we make an independent inquiry of the entire record
to determine if the court abused its discretion by imposing the sanction. Daniel v.
Kelley Oil Corp., 981 S.W.2d 230, 234 (Tex. App.—Houston [1st Dist.] 1998, pet.
denied) (op. on reh’g).
          Rule of Civil Procedure 215.2 allows a trial court to enter “just” sanctions for
a party’s failure to comply with a discovery order or request. Tex. R. Civ. P. 215.2. 
The Supreme Court of Texas in TransAmerican Natural Gas Corp. v. Powell
developed a two-part test for courts to apply when determining whether a sanction is
“just.” 811 S.W.2d 913, 917 (Tex. 1991). First, there must be a direct nexus among
the offensive conduct, the offender, and the sanction imposed. Spohn Hosp. v.
Mayer, 104 S.W.3d 878, 882 (Tex. 2003) (citing TransAmerican, 811 S.W.2d at 917). 
A just sanction must be directed against the abuse and toward remedying the
prejudice caused to the innocent party, and the sanction should be visited upon the
offender. Id. 
          Second, just sanctions must not be excessive. TransAmerican, 811 S.W.2d at
917. That is, a sanction imposed for discovery abuse should be no more severe than
necessary to satisfy its legitimate purposes, which includes securing compliance with
discovery rules, deterring other litigants from similar misconduct, and punishing
violators. Id.; see Spohn Hosp., 104 S.W.3d at 882; Chrysler Corp. v. Blackmon, 841
S.W.2d 844, 849 (Tex. 1992). For this reason, the supreme court requires courts to
consider less stringent sanctions and whether such lesser sanctions would fully
promote compliance. TransAmerican, 811 S.W.2d at 917; see Cire, 134 S.W.3d at
839; Spohn Hosp, 104 S.W.3d at 882. 
          2.       Scott Bader’s Abuse of the Discovery Process
          Scott Bader first contends that the discovery abuse sanctions are “unjust”
because it did not abuse the discovery process. See In re Supportkids, Inc., 124
S.W.3d 804, 807 (Tex. App.—Houston [1st Dist.] 2003, orig. proceeding)
(recognizing that determination of whether direct relationship exists between
offensive conduct and sanctions imposed “necessarily requires determining whether
the underlying conduct actually constitutes an abuse of the discovery process”). As
discussed, the trial court listed in its findings of fact six bases to sanction Scott Bader
for discovery abuse. On appeal, Scott Bader attacks the trial court’s findings that it
abused the discovery process by failing to identify Terry Strickland, by altering
invoices to conceal customer information, and by failing to produce timely the Boothe
memorandum.


 
          Scott Bader contends that Terry Strickland’s identity was disclosed at various
points throughout the discovery process. Scott Bader also contends that Strickland
was only the director of Scott Bader for a short period in 1998. Sandstone does not
dispute either contention. Rather, the basis of the discovery sanction was that
discovery was propounded to which Scott Bader should have disclosed, not only
Strickland’s name, but also the various key roles Strickland played with regard to
managing Scott Bader and his knowledge of the testing and formulation of Texigel. 
Scott Bader points out that, when it was requested to disclose the identity of persons
with knowledge regarding such matters as testing and formulation of Texigel or with
knowledge of changes made to Texigel since 1999, Scott Bader responded that none
of its U.S. employees had such knowledge. Though such response was technically
correct, it could also be viewed as misleading. Strickland was a director of Scott
Bader at a time critical to the lawsuit and was a person with knowledge regarding
matters central to Sandstone’s claims in this suit. Accordingly, we cannot say the trial
court abused its discretion by imposing sanctions for Scott Bader’s failure to disclose
Strickland’s identity in conjunction with the roles he played and the knowledge he
possessed.
          Scott Bader also challenges the trial court’s finding that Scott Bader produced
customer invoices in a manner calculated to conceal customer information from
Sandstone; that is, that Scott Bader redacted customer information from the invoices
produced to Sandstone to hide the identity of other customers, which may have had
product complaints similar to those of Sandstone. 
          In response to the sanctions motions, Scott Bader offered the affidavit of its
president, Nick Padfield, to explain that the invoices had been redacted as part of the
ordinary course of Scott Bader’s business, not to conceal information from Sandstone. 
According to Padfield, the customer and pricing information had been marked out
because the invoices are stored in a warehouse in which Scott Bader’s competitors
also store documents. Padfield stated that the information had been redacted to
protect competitive pricing information for its product. The trial court ultimately
found this explanation to be “inadequate” and lacking “credibility.” As we have
previously recognized, the trial court is entitled to judge the credibility of the
witnesses and the weight of their testimony in the context of a sanctions hearing.
Daniel, 981 S.W.2d at 232. A finding that the documents had been altered to conceal
customer information from Sandstone is also supported, as noted by the trial court,
by the fact that, while customer information had been marked out on some of the
invoices, other invoices did not have redacted customer information. 
          Based on the record, we cannot conclude that the trial court abused its
discretion by finding that Scott Bader abused the discovery process by producing
invoices in a manner calculated to conceal customer information.
          Scott Bader further contends that no discovery abuse arose from its failure to
produce the Boothe memorandum until five months before trial. It is uncontested that
the Boothe memorandum was produced for the first time as part of the 8,000-page
document production on March 1, 2005 and is the first page of a 17-page document. 
          The record also reveals that the document was produced by Scott Bader,
without the Boothe memorandum, on July 15, 2004. The second page of the
document had a handwritten number “1” on the top, right corner to make the second
page appear as if it were the first page of the document, rather than the second. The
deletion of the document was never pointed out to Sandstone, rather, the 17-page
document was ultimately produced with the Boothe memorandum toward the end of
an 8,000-page document production. The record further reveals that at least eight
witnesses, including the memorandum’s author, David Boothe, were deposed before
Sandstone had received the memorandum. Therefore, based on the record, we cannot
conclude that the trial court abused its discretion by finding that Scott Bader’s manner
of producing the Boothe memorandum was sanctionable conduct.
          As mentioned, the trial court awarded sanctions based not only on these three
incidents of discovery abuse, but also on the other sanctionable conduct listed in the
sanctions order. We recognize that, in assessing sanctions, the trial court is entitled
to consider the entire course of the litigation. Broesche v. Jacobson, 218 S.W.3d 267,
(Tex. App.—Houston [14th Dist.] 2007, pet. denied). Based on the entire record and
the instances of misconduct we have discussed, we conclude the trial court did not
abuse its discretion by finding that Scott Bader had engaged in sanctionable conduct
during the discovery process. 
          Next, we determine whether the trial court abused its discretion by assessing
the sanctions challenged by Scott Bader.
          3.       Partial Default Judgment Limiting Issues in Dispute
          As mentioned, the trial court ordered that the jury be instructed that Scott
Bader’s product did not meet specifications and that product specifications provided
by Scott Bader to Sandstone had been modified, which was treated as a partial default
judgment against Scott Bader. Concomitantly, the trial court prohibited Scott Bader
from rebutting “the factual presumptions above” and struck Scott Bader’s affirmative
defenses “addressed to this issue.” Scott Bader contends that the trial court abused
its discretion by imposing these sanctions without considering the imposition of
lesser sanctions. We agree. 
          Because a sanction imposed for discovery abuse should be no more severe than
necessary to satisfy its legitimate purposes, courts must first consider the availability
of less stringent sanctions and whether such lesser sanctions would fully promote
compliance. See TransAmerican, 811 S.W.2d at 917. To this end, the record must
reflect that the court considered the availability of lesser sanctions. Otis Elevator Co.
v. Parmelee, 850 S.W.2d 179, 181 (Tex. 1993); Chrysler Corp. v. Blackmon, 841
S.W.2d 844, 852–53 (Tex. 1992). In this respect, the Cire court explained, “The trial
court must analyze the available sanctions and offer a reasoned explanation as to the
appropriateness of the sanction imposed.” 134 S.W.3d at 842; see also GTE
Commc’n Sys. Corp. v. Tanner, 856 S.W.2d 725, 729 (Tex. 1993). 
          Here, the trial court stated in the sanctions order that the imposed sanctions
were “appropriate and necessary because a lesser sanction will not promote
compliance.” It continued, “The Court has considered the possibility of all lesser
available options. Under these circumstances, however, there is no lesser sanctions
available to address and deter Defendant SCOTT BADER’s conduct while preserving
SANDSTONE’s rights.” 
          Like other courts before us, “[w]e give no deference to such unsupported
conclusions” regarding the trial court’s consideration of lesser sanctions.


 GTE, 856
S.W.2d at 729; accord In re Adkins, 70 S.W.3d 384, 391 (Tex. App.—Fort Worth,
2002, orig. proceeding); cf. Cire, 134 S.W.3d at 842 (“The discussion in the trial
court’s order goes beyond simply stating that lesser sanctions would not be effective;
the order contains an extensive, reasoned explanation of the appropriateness of the
sanction imposed, demonstrating that the trial court considered the availability of less
stringent sanctions as we have required.”). Beyond this general statement and
description of the offensive conduct, the trial court in this case offered no reasoned
explanation of the appropriateness of the sanctions imposed. See Citibank v. Hanke,
No. 03-04-00641-CV, 2006 WL 952538 at *3 (Tex. App.—Austin Apr. 14, 2006, no
pet.) (mem. op.) (reversing sanctions award, court noted that, although sanctions
order referred to certain behavior by Citibank to support sanctions, no reasoned
explanation of appropriateness of sanctions, based on that behavior, was provided in
order). The record does not otherwise reveal that the trial court considered lesser
sanctions or indicate why lesser sanctions would not deter Scott Bader “while
preserving the rights of Sandstone.”


 
          The trial court did not comply with the second prong of the TransAmerican test
by insuring that the partial default judgment sanctions assessed against Scott Bader
were not excessive. The guiding rules with respect to discovery-abuse sanctions
required the trial court to consider the availability of lesser sanctions. See GTE, 856
S.W.2d at 729; TransAmerican, 811 S.W.2d at 917. Based on the record before us,
we hold that the trial court abused its discretion (1) by ordering that the jury be
instructed that Scott Bader’s product did not meet specifications and that product
specifications provided by Scott Bader to Sandstone had been modified, (2) by
prohibiting Scott Bader from rebutting these presumptions, and (3) by striking Scott
Bader’s affirmative defenses “addressed to this issue,” without first considering lesser
sanctions.


 See Supportkids, 124 S.W.3d at 808.
          4.       Use of Deposition Testimony At Trial
          Scott Bader also challenges the trial court’s sanction prohibiting it from using
at trial the deposition testimony of eight witnesses, whose depositions were taken
after the March 1, 2005 document production, unless Scott Bader first demonstrated
that “such deposition was taken after full production of documents.” As with the
sanctions discussed above, the record does not show that the trial court first
considered whether lesser sanctions were available, and if so, whether such lesser
sanction would promote compliance.


 Accordingly, we hold that the trial abused its
discretion by prohibiting Scott Bader’s use of the eight depositions without
considering lesser sanctions. See In re Patton, 47 S.W.3d 825, 828 (Tex. App.—Fort
Worth 2001, orig. proceeding) (concluding that trial court abused its discretion by
excluding trial exhibits when no lesser sanctions considered); cf. Adams v. Allstate
County Mut. Ins. Co., 199 S.W.3d 509, 513–514 (Tex. App.—Houston [1st Dist.]
2006, pet. denied) (holding no abuse of discretion shown for striking affidavit when
trial court had previously implemented less stringent measure to no avail).
          5.       Attorney’s Fees as Sanctions 
          The trial court awarded $68,000 in sanctions for attorney’s fees and expenses
“attributable to Scott Bader’s discovery abuse.” Scott Bader states in its brief that,
to the extent that it was properly found to have abused the discovery process, it “does
not quarrel with assessment of attorney’s fees related to preparing and arguing a
meritorious motion for sanctions, or to undertaking additional discovery made
necessary by improperly withheld documents.” Instead, Scott Bader complains that
the sanctions are not shown to be directly related to the sanctionable conduct because
the sanctions are unsupported in the record by competent evidence. 
          In support of its request for attorney’s fees as sanctions, Sandstone’s submitted
the affidavit of one its attorneys, Allison B. Waters, who stated,
To date, our total fees [are] at least $411,066.55. Costs, which include
travel expenses for numerous depositions (in Colorado, Ohio,
Pennsylvania and Florida), are at least $36,151.84. Of these amounts,
I believe [Sandstone] has incurred fees and expenses totaling $68,000, 
which are associated with Scott Bader’s discovery abuse, as outlined in
Sandstone’s trial brief on spoliation, which was presented to the Court
on August 15, 2005.
          In the trial court, Scott Bader objected that the affidavit was “conclusory, not
supported by any evidence and does not establish that any of the expenses or fees
were reasonable or necessary.” On appeal, Scott Bader contends that “[a] conclusory
statement regarding the amount of attorney’s fees incurred is insufficient to support
an award of fees when there is no indication of what the fees were and no basis to
establish whether they were reasonable.” Scott Bader asserts that “Sandstone’s
evidence of fees does not establish that the fees incurred were reasonable and
necessary or summarize the hours worked and rate charged.” 
          In cases in which the judgment is not one for earned attorney’s fees, but rather
a judgment imposing attorney’s fees as sanctions, it is not invalid because a party fails
to prove attorney’s fees. Condit v. Gonzales, No. 13-04-426-CV, 2006 WL 2788251,
at *12 (Tex. App.—Corpus Christi Sept. 28, 2006, no pet.) (mem. op.) (citing Glass
v. Glass, 826 S.W.2d 683, 688 (Tex. App.—Texarkana 1992, writ denied)). “When
attorney’s fees are assessed as sanctions, no proof of necessity or reasonableness is
required.” Miller v. Armogida, 877 S.W.2d 361, 365 (Tex. App.—Houston [1st Dist.]
1994, writ denied); see Brantley v. Etter, 677 S.W.2d 503, 504 (Tex. 1984). 
Therefore, by focusing on the lack of evidentiary value of Waters’s affidavit to prove
the reasonableness and necessity attorney’s fees actually earned by Sandstone’s
attorneys, Sandstone has not demonstrated that the trial court abused its discretion
when it awarded $68,000 in attorney’s fees as sanctions. See Allied Assoc. v. INA
County Mut. Ins., 803 S.W.2d 799, 799 (Tex. App.—Houston [14th Dist.] 1991, no
writ). 
          Moreover, the record indicates that much of Sandstone’s attorney time was
affected by the sanctionable conduct. At least eight depositions were taken by
Sandstone in locations across the United States without the benefit of the Boothe
memorandum. In addition, the record reflects that Sandstone’s counsel prepared two
motions to compel discovery and engaged in communications with Scott Bader’s
counsel over a substantial period in an attempt to obtain discoverable information. 
Though the filings from the summary judgment proceedings are not contained in the
record, it can reasonably be surmised that Sandstone’s counsel spent time addressing
the no-evidence motions for summary judgment that were ultimately stricken in the
sanctions order. The record further shows that Sandstone’s counsel prepared several
filings in conjunction with the motion for sanctions and attended hearings on the
sanctions request. 
          Accordingly, we conclude that Scott Bader has not shown that the trial court
abused its discretion by awarding $68,000 in attorney’s fees and expenses as
sanctions.
B.      Sanctions for Violating the In Limine Order
          Wright and her law firm (collectively “Wright”) also appeal the trial court’s
sanction for Wright’s violation of an in limine order, resulting in a mistrial. As
mentioned, the trial court assessed monetary sanctions in the amount of $79,012.40
against Wright and her law firm for “reasonable and necessary” attorney’s fees and
expenses incurred by Sandstone from voir dire through the hearing on the motion for
sanctions related to the first trial. 
          Wright and her firm contend on appeal that Sandstone did not properly
establish these fees. The fees awarded represent the legal fees incurred by Sandstone
for one week’s worth of trial preparation and for attending trial. Wright and her firm
contend that Sandstone should not receive the fees for the one week of trial
preparation because the second trial commenced almost immediately after the
mistrial. Wright and her firm also point out that, at the sanctions hearing, Sandstone
presented one lump sum bill and did not present an itemized bill, an affidavit, or
sworn testimony to support the award. 
          The record shows that Wright never raised the challenges in the trial court that
are now raised on appeal regarding the sanctions. To preserve a complaint for
appellate review, a party must have presented a request, objection, or motion to the
trial court stating specific grounds for the ruling desired. See Tex. R. App. P.
33.1(a)(1). We have previously applied the rule to a party’s failure to raise objections
to sanctions in the trial court. See Valdez v. Valdez, 930 S.W.2d 725, 728 (Tex.
App.—Houston [1st Dist.] 1996, no writ) (holding appellant waived objection to
sanctions raised for first time on appeal). By failing to raise the complaints now
presented, Wright never gave the trial court the opportunity to correct the alleged
error. We hold that Wright has waived the challenges presented on appeal to the
sanctions assessed for violating the in limine order. See id.
C.      Conclusion Regarding Sanctions Appeal
          To summarize, we hold that the trial court abused its discretion by ordering that
(1) the jury be instructed that Scott Bader’s product did not meet specifications and
that product specifications provided by Scott Bader to Sandstone had been modified,
which instructions the trial court ordered be treated as a partial default judgment
limiting issues in dispute; (2) certain of Scott Bader’s affirmative defenses be
stricken; and (3) Scott Bader be prohibited from using at trial the testimony of eight
identified witnesses.


 We hold that the trial court did not abuse its discretion by
assessing monetary sanctions against Scott Bader in the amount of $68,000 for
discovery abuse and by assessing monetary sanctions against Wright and her firm in
the amount of $79,012.40 for violating an in limine order.
          Accordingly, Scott Bader’s third issue is sustained, in part, and overruled in
part.
Appeal of Judgment Rendered Following Jury Trial
          Next, in appellate cause number 01–06–00593–CV, we determine the propriety
of the money judgment rendered in Sandstone’s favor against Scott Bader, following
the jury trial. In its third issue, Scott Bader contends that the judgment should be
reversed and remanded because the sanctions rendered by the trial court resulted in
an erroneous jury charge. 
A.      Background Relevant to Claimed Charge Error
          As discussed, a mistrial was declared based on the misconduct of Scott Bader
during trial. The second trial began shortly after the mistrial. On September 15,
2005, in the midst of trial, the trial court signed a “Supplemental Order On
Sanctions,” which provided, in relevant part, as follows:
Issues have arisen during trial requiring application of the August
Sanctions order. It is 
 
ORDERED that the breach of warranty is established with damages
from Defendants’ breach to be submitted to the jury; and Defendant may
bring forward evidence that does not rely on any stricken deposition to
establish causation for failures other than an affirmative defense of
Plaintiff’s conduct.
 
ORDERED that Defendant’s affirmative defenses and its general denial
were stricken to the extent that the Court’s prior order to preclude
litigation of issues rebutting the established issues. Defendants are not
entitled to raise quality control issues about Sandstone to negate
evidence that the product was out of specification before reaching
Sandstone. . . .
          When the case was presented to the jury, the court gave the following
instructions: 
BINDING INSTRUCTIONS
The following instructions are binding on the jury.
You are given these binding instructions by the Court for all purposes
in this Charge and to govern your deliberations and answers to the Jury
Questions.
 
The Jury is instructed that:
 
(1)The specifications that Scott Bader provided to Sandstone for the
product during mid-1999 and 2001 were modified.
 
(2)The product that was shipped between mid-1999 and 2001 did not
meet the specifications Scott Bader provided to Sandstone.
 
These instructions are also binding instructions. You are further
instructed that:
 
Modification of Specifications
 
Such modification of the specifications is a breach of the sales contract
between Scott Bader and Sandstone. 
 
Such modification is a breach of the warranty from Scott Bader to
Sandstone.
 
Failure to Meet Specifications
 
Such failure to meet specifications is a breach of the sales contract
between Scott Bader and Sandstone. 
 
Such modification [sic] is a breach of the warranty from Scott Bader to
Sandstone.



          The first jury question following the binding instructions asked the jury, “What
sum of money, if any, if paid now in cash, would fairly and reasonably compensate
Sandstone Products, Inc. for its damages, if any, that resulted from modification of
specifications and failure to meet specifications as instructed?” In response to this
question, the jury awarded Scott Bader a total of $3,375,000 in actual damages. 
          The next four questions pertained to Sandstone’s DTPA claim. The jury found
that Scott Bader had engaged in a “false, misleading, or deceptive practice” and in
unconscionable actions and that such actions were a producing cause of damages to
Sandstone. The jury also found that Scott Bader’s modification of specifications and
failure to meet specifications was a producing cause of damages to Sandstone. The
jury further found that Scott Bader’s DTPA violations were committed knowingly. 
In addition to the actual damages awarded in the first jury question, the jury awarded
$950,000, $225,000, and $25,000 for each of Scott Bader’s knowing violations of the
DTPA.
          The jury further found that Scott Bader had committed fraud and negligent
misrepresentation. With regard to these claims, the jury awarded Sandstone $300,000
for the reasonable and necessary cost of the repair or replacement of the failed roof
coatings and $30,000 for Sandstone’s past lost profits. Lastly, the jury awarded
Sandstone $486,000 for attorney’s fees. 
          The trial court rendered judgment awarding Sandstone the actual damages
found by the jury in Question Number 1, totaling $3,375,000, the $950,000 in
additional damages awarded for Scott Bader’s knowing DTPA violation, and
$486,000 for attorney’s fees. The trial court also awarded $903,667 in pre-judgement
interest.
          In its third issue, Scott Bader contends that the trial court erred by including
the “Binding Instructions” in the jury. 
B.      Standard of Review
          We review the trial court’s submission of jury instructions for an abuse of
discretion. See Plainsman Trading Co. v. Crews, 898 S.W.2d 786, 791 (Tex. 1995). 
When an incorrect jury instruction was given, we reverse only if the instruction “‘was
reasonably calculated to and probably did cause the rendition of an improper
judgment.’” Bed, Bath & Beyond, Inc. v. Urista, 211 S.W.3d 753, 757 (Tex. 2006)
(quoting Reinhart v. Young, 906 S.W.2d 471, 473 (Tex. 1995)); see Tex. R. App.
44.1(a)(1). We examine the entire record to evaluate whether the instruction probably
caused the rendition of an improper verdict. Urista, 211 S.W.3d at 757. 
C.      Propriety of Binding Instructions 
          In its third issue, Scott Bader contends that the Binding Instructions were
improper. Given our holding in appellate cause number 01–05–00940–CV that the
trial court abused its discretion by ordering, in its August 22 sanctions order, that the
jury be instructed that Scott Bader’s product did not meet specifications and that the
product specifications provided by Scott Bader to Sandstone had been modified, we
conclude that the Binding Instructions given to the jury were improper. 
          Sandstone contends that the Binding Instructions were proper because they
were not based on the August 22 sanctions order but rather on the September 15
Supplemental Order On Sanctions or, alternatively, resulted from a directed verdict 
granted at the charge conference. Sandstone also asserts that Scott Bader waived its
objection to the Binding Instructions. We disagree with all three of Sandstone’s
contentions. 
          We are cognizant that the Binding Instructions not only instructed the jury that
Scott Bader’s product did not meet specifications and that the product specifications
provided by Scott Bader to Sandstone had been modified, as provided in the August
22 sanctions order, but also instructed the jury that Scott Bader’s modification of
specifications and failure to meet specifications each constituted breach of contract
and breach of warranty. Though these additional instructions expand on the original
instructional language found in the original August 22 sanctions order, the record
indicates that these additional instructions derived from the original sanctions. On
its face, the September 15 order indicates that it served to supplement the August 22
sanctions order and to clarify how the August 22 sanctions should be applied. In
other words, the September 15 sanctions order was not an independent sanctions
order, but was a supplemental order dependent on the August 22 sanctions. 
Moreover, the Binding Instructions instructed the jury that Scott Bader’s conduct
constituted both breach of contract and breach of warranty while the September 15
Supplemental Order On Sanctions ordered only that “the breach of warranty [claim]
is established” and did not address the breach of contract claim.
          At the charge conference, Scott Bader objected to the Binding Instructions. In
so doing, Scott Bader renewed its objection to the sanctions order by stating that it
“did not commit sanctions abuse” and, if it did, that the abuse could have been
remedied by lesser sanctions. Scott Bader also objected on the grounds that the
Binding Instructions were an “expansion of the [original] sanctions order.” 
Specifically, Scott Bader objected to the language in the Binding Instructions which
instructed the jury that Scott Bader’s modification of specifications and its failure to
meet specifications constituted breach of contract and breach of warranty. Scott
Bader asserted that such instruction impermissibly expanded on the language of the
original sanctions order. Thus, Scott Bader preserved its challenge to the Binding
Instructions.
          Sandstone also contends that the Binding Instructions were not derived from
August 22 sanctions order but were based on a request by Sandstone for a directed
verdict at the charge conference based only on the evidence at trial. Such contention
is not supported by the record. 
          When Scott Bader objected on the ground that the Binding Instructions
improperly expanded on the August 22 sanctions language, the trial court stated that
“I’ve instructed the verdict with regard to that.” Only after that comment by the trial
court did Sandstone move for directed verdict. In requesting the directed verdict,
Sandstone stated that it requested a directed verdict based on the evidence that was
presented and on the sanctions order. At which point, the trial court stated that it
believed it had previously granted a directed verdict on the issues set out in the
Binding Instructions. Thus, it is apparent from the record that the Binding
Instructions do not arise from a directed verdict based on the evidence, rather the
Binding Instructions were based on the previously ordered sanctions.
          Because they were derived from the improper August 22 sanctions, we
conclude that the trial court abused its discretion when it included the Binding
Instructions in the charge. Next, we determine whether the Binding Instructions were
harmful.
D.      Harm 
          As mentioned, the trial court’s judgment awards Sandstone $3,375,000 in
actual damages. This amount corresponds to the total amount of actual damages
awarded by the jury in response to Question 1, which immediately followed the
Binding Instructions. Question 1 was an unpredicated damages question, which read,
“What sum of money, if any, if paid now in cash, would fairly and reasonably
compensate Sandstone Products, Inc. for its damages, if any, that resulted from
modification of specifications and failure to meet specifications as instructed?”           Immediately following Question 1 was a series of questions related to
Sandstone’s DTPA claim. The jury made a positive liability finding against Scott
Bader regarding Sandstone’s DTPA claim. From the face of the charge, it cannot be
determined whether the jury awarded the $3,375,000 in actual damages based on the
trial court’s instructed liability findings for Sandstone’s breach of contract or breach
of warranty claims, or whether the award was based on the jury’s DTPA liability
finding. It is apparent, however, that the damages finding was shaped by the
improper Binding Instructions.
          In reaching its damages finding in Question 1, the jury was limited to
considering only those damages that “resulted from modification of specifications and
failure to meet specifications as instructed.” (Emphasis added.) As a result, even if
the award was based on the DTPA liability finding, the only DTPA violations for
which damages could be awarded in Question 1 were those arising “from [Scott
Bader’s] modification of specifications and failure to meet specifications as
instructed.” Thus, regardless of which liability theory the jury positively found to
support the damages award in response to Question 1, we hold that the Binding
Instructions probably caused the rendition of an improper judgment.


 See Tex. R.
App. 44.1(a).
          We sustain Scott Bader’s third issue.
 
E.      Disposition of Appeal
          In issue one, Scott Bader challenges the admissibility of Sandstone’s causation
expert, asserting that the expert opinion was unreliable and thus inadmissible. Scott
Bader further alleges that, because the expert’s opinion was the only evidence of
causation, “there is no evidence to support Sandstone’s causation theory.” In issue
two, Sandstone contends that the evidence was legally insufficient to support the
damages awarded by the jury in response to Question 1. 
          We recognize that the legal sufficiency challenges raised by Scott Bader in
both issues, if successful, result in rendition. Holt Atherton Indus., Inc. v. Heine, 835
S.W.2d 80, 86 (Tex. 1992) (recognizing that, as general rule, “when we sustain a no
evidence point of error after a trial on the merits, we render judgment on that point.”). 
We do not separately address issues one and two, however. Even if sustained,
resolution of issues one and two would not result in greater relief for Scott Bader, in
this case, than that afforded by our resolution of the charge error addressed above
with respect to Scott Bader’s third issue. That is, we would still remand instead of
reverse and render if we sustained either issue one or two because the trial court’s
sanctions prevented this case from being properly developed and presented at trial. 
          Appellate courts have broad discretion to remand for a new trial in the interest
of justice. See Tex. R. App. P. 43.3(b). In this case, regardless of whether Sandstone
presented legally insufficient evidence to support the amount of actual damages
awarded by the trial court, or presented insufficient evidence of causation, we
conclude that justice would be best served by remanding the case. We may remand
for new trial when damages were improperly calculated by the plaintiff, and the
interest of justice requires that the plaintiff be given an opportunity to show the
proper measure of his damages. Walters v. Northcutt, No. 12-03-00247-CV, 2005
WL 341694 at*10–11 (Tex. App.—Tyler Feb. 10, 2005, no pet.) (mem. op.); Varel
Mfg. Co. v. Acetylene Oxygen Co., 990 S.W.2d 486, 500 (Tex. App.—Corpus Christi
1999, no pet.); Williams v. Gaines, 943 S.W.2d 185, 193–94 (Tex. App.—Amarillo
1997, writ denied); A.B.F. Freight Sys., Inc. v. Austrian Imp. Serv ., Inc., 798 S.W.2d
606, 616 (Tex. App.—Dallas 1990, writ denied). Remand is also appropriate when
a case, for any reason, has not been fully developed. United States Fire Ins. Co. v.
Carter, 473 S.W.2d 2, 3 (Tex. 1971); Kondos v. Lincoln Prop. Co., 110 S.W.3d 716,
724 (Tex. App.—Dallas 2003, no pet.); Bayway Serv., Inc. v. Ameri-Build Constr.,
L.C., 106 S.W.3d 156, 161 (Tex. App.—Houston [1st Dist.] 2003, no pet.). 
          Here, the sanctions ordered by the trial court affected and shaped the
presentation and development of this case during trial, for both Sandstone and Scott
Bader. Had the sanctions not been levied, it seems indisputable that both sides would
have presented additional evidence during trial. In light of our reversal today of the
sanctions in appellate cause number 01-05-00940-CV, we conclude that this case is
properly remanded for further proceedings on the issues of liability and damages. See
Tex. R. App. P. 44.1(a)(1). 
Conclusion
          In appellate cause no. 01-05-00940-CV, we affirm the trial court’s judgment
as to the monetary sanctions. We reverse the portion of the judgment, as discussed 
above, ordering that (1) the jury be instructed that Scott Bader’s product did not meet
specifications and that product specifications provided by Scott Bader to Sandstone
had been modified, which instructions the trial court ordered be treated as a partial
default judgment limiting the issues in dispute; (2) certain of Scott Bader’s
affirmative defenses be stricken; and (3) Scott Bader be prohibited from using at trial
the testimony of eight identified witnesses, and remand the case for further
proceedings.
 

          In appellate cause no. 01-06-00593-CV, we reverse the judgment of the trial
court and remand for further proceedings.


 




                                                                        Laura Carter Higley
                                                                        Justice

Panel consists of Justices Nuchia, Keyes, and Higley.

Justice Keyes, dissenting.