# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00385-CV

**Hebert Acquisitions, LLC, Appellant**

**v.**

**Tremur Consulting Contractors, Inc.; Chris R. Murray; and
San Juanita Murray, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. D-1-GN-08-003540, HONORABLE RHONDA HURLEY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

After Hebert Acquisitions, LLC ("Hebert") acquired the assets of Tremur Consulting Contractors, Inc. ("Tremur") from Chris and San Juanita Murray, Hebert brought suit for breach of contract stemming from alleged violations of the Asset Purchase Agreement (APA) that governed the transaction.[1] The Appellees brought a counterclaim for breach of the APA. After a bench trial, the trial court found in favor of the Appellees and awarded damages, pre- and post-judgment interest, and attorneys' fees and costs. On appeal, Hebert argues that the trial court misconstrued the APA

---

[1] In their briefs, the parties refer to Chris and San Juanita Murray by their first names and, when necessary, refer to Tremur as "Old Tremur" prior to the sale of the company to Hebert and to Tremur as "New Tremur" following the sale of the company. For the sake of consistency, we will refer to the parties in the same manner. In addition, we will refer to Chris, San Juanita, and Tremur collectively as the "Appellees," and we will refer to Hebert's principals, Dane and Patricia Hebert, by their first names.

and that the evidence is legally and factually insufficient to support the trial court's judgment. We affirm the judgment in part and reverse and render judgment in part.

## BACKGROUND

Tremur is a construction company providing site preparation, utilities, and plumbing work.[2] The company was founded by Chris, who ran the company for over 20 years. San Juanita, Chris's wife, served as the company's safety manager beginning in 2001, and also helped with payroll and accounting. Chris and San Juanita decided they wanted to sell Old Tremur, listing it for the first time in 2003.

In 2007, Tremur came to the attention of Hebert's principals, Dane Hebert ("Dane"), his wife Patricia, and Bill Lee. Dane has a master's degree in accounting and was a Certified Public Accountant for more than 20 years. He also had experience as a business consultant, though prior to the acquisition of Tremur he had no experience running a construction company. Dane met with Chris and San Juanita to discuss the operations of the business in March or April of 2007.

After Hebert expressed interest in acquiring Tremur, the parties began a due diligence process lasting approximately four months. As part of the process, Dane was provided with financial statements for the company, including year-end statements for 2005 and 2006 and for the first four months of 2007.[3] The financial statements had been reviewed by Tremur's CPA, Don Steinle, who indicated in a cover letter attached to the statements that the financials had been prepared in

---

[2] The facts recited herein are from the testimony and exhibits admitted at trial.

[3] Dane was also provided with year-end financials for 2002, 2003, and 2004.

accordance with generally accepted accounting principles (GAAP).[4]  During the due diligence period, Dane was also given access to paper and electronic files detailing the company's financials at Tremur's office.  In addition, Dane was provided with QuickBooks records containing electronic copies of the records two to three weeks before the closing date.  John Austin, the business broker for Tremur, testified that Dane was also given a bound paper copy of Tremur's financial records, though Dane stated that he did not receive any such materials.  Dane also received Old Tremur's tax returns.[5]

Sometime prior to closing, Chris was informed that Old Tremur had underbid a project for the Seton Women's Tower.  The error stemmed from confusion involving the site plans, which were "vague" and did not reflect the existence of an elevator pit crawl space underneath mass excavation of the building.  As a result, five additional feet of excavation were required.[6]  In his deposition testimony, Chris stated that he discussed the error with the contractor on the project, Rogers-O'Brien Construction.[7]  Rogers-O'Brien indicated that it would attempt to rectify the

---

[4]  Steinle testified that the financials were prepared in the same way that Tremur prepared reports for its bonding companies, which require financials to be GAAP-compliant.

[5]  Dane testified that he did not have experience using QuickBooks prior to closing, which hindered his ability to make use of the electronic files he was given.  Austin, however, testified that he observed Dane using QuickBooks in the Tremur offices prior to closing, and that Dane "showed [Austin] something [he] didn't know how to do," leading Austin to conclude that Dane was "pretty good" with the program.

[6]  According to Chris, Jon Scheff, the senior estimator for Old Tremur, indicated that the amount of the underbid was $168,760.  Chris later testified that the error was "about a[n] $80,000 mistake."  Regarding bid errors, Chris stated, "All jobs have mistakes.  I mean, in the industry, of course[,] the general contention is, whoever makes the most mistakes gets the job[.]"

[7]  All of Chris's deposition testimony was admitted; Chris also testified at trial.

situation by increasing compensation to Old Tremur via a series of change orders. According to Chris, these change orders resolved a majority of the bid error, "if not all of it." At trial, Chris testified that an additional $60,000 payment was sent from Seton to New Tremur to cover some of the costs of the error. He also testified that 98% of the work on the Seton project had been completed prior to closing and that the cost of the work was absorbed by Old Tremur.[8]

On July 31, 2007, the parties closed the asset sale of the company pursuant to the terms of the APA executed by the parties. At closing, the parties were represented by counsel. Under the terms of the APA, Hebert paid $1,395,000 for the company and its assets.[9] The APA also included a provision detailing additional payments, called contingent price payments, to be made on the first three anniversaries of the closing if specified thresholds for gross revenues were met. For the first contingent price payment, which was to be based on gross revenues for the year ending July 31, 2008,[10] Hebert agreed to pay the Appellees $447,600 if total gross revenues exceeded $5 million.[11]

---

[8] Chris could not recall whether he informed Dane of the error. Dane testified that he was not told of the error before closing.

[9] The purchase was financed via a Small Business Administration (SBA) loan that was approved based on the financial reports of Old Tremur. Dane testified that the loan was approved only after an "extensive" and "stringent" review of the company's financials by the SBA.

[10] While the company's financials are generally calculated based on a year-end date of December 31, the APA specified that the gross revenues calculations for the contingent price payment would be calculated for the period ending on the first, second, and third anniversaries of the date of closing, resulting in a year-end date of July 31 for those periods.

[11] According to the financial reports reviewed by Steinle, "Revenues Earned" for the year ending December 31, 2005 totaled $1,633,025, while "Revenues Earned" for the year ending December 31, 2006 totaled $3,363,033.

Chris and San Juanita agreed to remain at Tremur as consultants for up to six months after closing in order to assist Dane and Patricia in managing the company at the outset. Chris and San Juanita also agreed to a non-compete clause in the APA that prevented them from involvement in a competing business for five years after the closing date.

Dane testified that, in January 2008, he became concerned about the company's cash flow, as he did not have the cash he expected based on the 2005 and 2006 financial reports. After comparing the financials he had received during the due diligence process with company records in the QuickBooks program, Dane concluded that the financial reports he had received had not been properly prepared and that he had paid too much for the company.[12] After a meeting between the parties and their counsel, Hebert filed suit against Chris, San Juanita, and Tremur in September 2008. Hebert contended that the Appellees had breached the APA by failing to provide GAAP-compliant financial statements, making misrepresentations as to the value of the company, and failing to disclose material adverse changes in the company prior to closing, including a bid error and undisclosed injuries resulting in worker's compensation claims.[13]

The Appellees counterclaimed for breach of contract. The Appellees asserted that Hebert was in breach of the APA for failing to make the first required contingent price payment,

[12] Dane testified that after performing adjustments to the 2005 and 2006 financials that, in his opinion, made them GAAP-compliant, he valued Old Tremur at $1,228,050—$771,950 less than the purchase price he agreed to based on the 2005 and 2006 financials he received from the Appellees. Dane testified that if he had been provided GAAP-compliant financial statements, Hebert would have offered $771,950 less to buy Old Tremur than it actually did.

[13] Although the complaint about undisclosed worker's compensation claims is stated as part of Hebert's first issue on appeal, Hebert failed to include any argument or briefing in support of this complaint and it is, therefore, waived. *See* Tex. R. App. P. 38.1(h); *Lairsen v. Slutzky*, 80 S.W.3d 121, 130 (Tex. App.—Austin 2002, pet. denied).

noting that New Tremur had accumulated more than $5 million in gross revenues for the year ending July 31, 2008, but had not paid the Appellees the $447,600 contingent price payment specified in the APA.[14] In addition, the Appellees asserted claims based on breach of the APA resulting from Hebert's failure to manage New Tremur in a manner consistent with the prior practices of Old Tremur, failure to pay retainage monies concerning projects completed by Old Tremur, and failure to properly credit stored materials. The Appellees also brought counterclaims for conversion, money had and received, tortious interference with contract, consequential damages, and failure to comply with conditions precedent of the APA.[15]

After a five-day bench trial, the trial court rendered judgment in favor of the Appellees. The trial court awarded $447,600 for the contingent price payment for 2008, $127,989.80 in retainage monies minus any retainage monies already paid, and $22,297.95 in stored materials, along with pre- and post-judgment interest and attorneys' fees and costs. The trial court entered findings of fact and conclusions of law, and this appeal followed.

**STANDARD OF REVIEW**

When reviewing a finding for legal sufficiency, we must credit evidence favorable to the judgment if a reasonable factfinder could, disregard contrary evidence unless a reasonable

---

[14] According to a financial report admitted into evidence, New Tremur had a "Total Income" of $5,577,496 for the fiscal year ending July 31, 2008. Even after paying Dane and Patricia annual salaries totaling $127,500, New Tremur had a "Net Income" of $656,507.

[15] The Appellees contended that the APA barred Hebert from asserting a claim for failure to disclose the percentage completion of contracts in process at the time of closing because Hebert did not submit the percentage-completion claim to a third party prior to trial. According to the APA, upon a disagreement as to allocation of costs, the parties "shall submit such information to the third party that certifies such completion and thereafter attempt to resolve any discrepancies."

fact-finder could not, and reverse the factfinder's determination only if the evidence presented in the trial court would not enable a reasonable and fair-minded factfinder to reach the judgment under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We will sustain the appellant's legal-sufficiency challenges if the record reveals: (1) the complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of a vital fact. *See id.* at 810. More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

When appealing the legal sufficiency of the evidence supporting an adverse finding on which appellant had the burden of proof, the appellant must show the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). In reviewing a "matter of law" challenge, we must first examine the record for evidence supporting the finding, then we will examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* The point of error should be sustained only if the contrary proposition is conclusively established. *Id.*

Under our legal-sufficiency review, we cannot disregard contrary evidence that conclusively establishes the opposite of a vital fact. *Id.* "Proper legal-sufficiency review prevents reviewing courts from substituting their opinions on credibility for those of the [factfinder], but proper review also prevents the [factfinders] from substituting their opinions for undisputed truth.

7

When evidence contrary to a verdict is conclusive, it cannot be disregarded." *City of Keller*, 168 S.W.3d at 816-17. This is equally true when the factfinder is the trial court, rather than a jury. *See id.* at 816 n.66 (citing *Murdock v. Murdock*, 811 S.W.2d 557, 560 (Tex. 1991)). While the factfinder is the sole judge of credibility, decisions regarding credibility must be reasonable, and the factfinder is not permitted to ignore undisputed testimony that is "clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *Id.* at 820.

In determining the factual sufficiency of the evidence to support a finding, courts of appeals are to weigh all the evidence, both for and against the finding. *Dow Chem. Co.*, 46 S.W.3d at 242. In reviewing a factual-sufficiency challenge to a finding where the burden of proof is on the complaining party, that party must show that "the adverse finding is against the great weight and preponderance of the evidence." *Id.* In conducting our review, we may not substitute our judgment for that of the factfinder, who is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

We review the trial court's conclusions of law de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Although appellants may not challenge a trial court's conclusions of law for factual sufficiency, we may review the trial court's legal conclusions drawn from the facts to determine whether the conclusions are correct. *Id.*

**DISCUSSION**

*Hebert's Claims*

In its first two issues, Hebert challenges the trial court's finding that the Appellees "fulfilled their obligations under the APA and satisfied the intent of the sales transaction." Hebert

8

identifies four ways in which it contends the Appellees breached the APA causing it damages. Hebert contends that they failed to provide GAAP-compliant financial statements prior to closing, failed to disclose an adverse material change in Old Tremur prior to closing, failed to pay Hebert for costs incurred due to back charges and warranty work, and misrepresented the percentage completion of projects in process by failing to properly disclose revenues in excess of costs in a manner that overstated the value of Old Tremur. We will address each contention in turn.

*GAAP-Compliant Financial Statements*

Hebert asserts that it conclusively proved that the Appellees breached the APA by providing financial statements for the years 2005 and 2006 that were not prepared in accordance with GAAP and that, as a consequence, Hebert suffered "valuation damages" in the amount of $771,950. On appeal, Hebert asks this Court to reverse the trial court's judgment and render judgment in its favor on both liability and damages resulting from this alleged breach. Having reviewed the evidence, however, we conclude that even assuming that the Appellees breached the APA in the manner alleged, an issue we need not reach, Hebert is not entitled to the relief it seeks. The evidence Hebert relies upon as "conclusive proof" of its damages is, in fact, legally insufficient to support an award of damages arising from the alleged breach.

In its brief, Hebert asserts that "the only evidence of damages is Dane's testimony that Hebert agreed to pay almost $800,000 more than it would have if the Murrays had given GAAP-compliant financial statements, as warranted." At trial, Dane testified that, relying on the allegedly deficient 2005 and 2006 financial statements, he evaluated Old Tremur's worth using a "cash flow" approach and arrived at the purchase price he offered. Dane testified that, after he had purchased the company, he discovered that the 2005 and 2006 financial statements he had relied on to arrive at his

9

offering price contained what he believed was improper accounting treatment of certain ongoing projects. Dane testified that he "went back and did a recalculation based upon the adjusted financials, and it shows the percent completion, if I had these adjustments in those financials, what the actual income would have been from business sales, and I used those new numbers to go back and recalculate what I would have offered as a purchase price had I had the actual—the correct GAAP financials." Hebert contends that it suffered damages in the amount of $771,950—the difference between what it claims it would have offered for the company and what it actually paid for the company.

As Hebert concedes in its brief, the only evidence of Hebert's damages arising from this alleged breach is Dane's testimony that if the Murrays had provided Hebert GAAP-compliant financial statements, Hebert would have offered $771,950 less than it actually paid. However, there is no evidence in the record that the Appellees would have accepted Hebert's offer and agreed to sell the company for the lower price. Damages must be established with a reasonable degree of certainty. *See A. B. F. Freight Sys., Inc. v. Austrian Import Serv., Inc.*, 798 S.W.2d 606, 615 (Tex. App.—Dallas 1990, writ denied). "There can be no recovery for damages which are speculative or conjectural." *Id.* The damages must be ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or direct inference, from known facts. *Berry Contracting, Inc. v. Coastal States Petrochemical Co.*, 635 S.W.2d 759, 761 (Tex. App.—Corpus Christi 1982, writ ref'd n.r.e.). There was no evidence that, had Hebert offered to purchase the company for $771,950 less, the Appellees would have accepted that offer. Rather, it is at least equally likely that Appellees would have rejected Hebert's

10

lower offer.[16]  Consequently, Dane's testimony is too speculative to support an award of damages. *See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 50 (Tex. 1998) (testimony about what a bid "would have been" is not legally sufficient evidence of damages). Hebert asserts that Dane's testimony was uncontroverted and is, therefore, conclusive proof of its damages.  The mere fact that evidence is uncontroverted, however, does not make it conclusive. *See City of Keller*, 168 S.W.3d at 816 ("Of course, there are few instances in which disputed evidence is conclusive, and many instances in which undisputed evidence is not.").  Neither Dane's own belief that Hebert could have acquired the company for $771,950 less than it paid nor his testimony about a hypothetical, speculative bargain that was never struck constitutes conclusive proof, or even probative evidence, of damages.

Nor are these so-called "valuation damages" recoverable under a benefit-of-the-bargain theory.  Generally, the measure of benefit-of-the-bargain damages is the difference between the value as represented to the injured party and the value actually received. *Fortune Prod. v. Conoco, Inc.* 52 S.W.3d 671, 681 (Tex. 2000).  The plaintiff must prove benefit-of-the-bargain damages by offering evidence of both the value as represented and the value of what was actually received. *See, e.g.*, *Gunn Infiniti, Inc. v. O'Byrne*, 18 S.W.3d 715, 716 (Tex. App.—San Antonio 2000, no pet.).

---

[16] In fact, Dane testified that is precisely what happened in a previous unconsummated transaction.  Dane testified that he had an opportunity to buy a different business and that "we were down to the last couple of days, and then some numbers changed on their financials, and we tried to go back and renegotiate with them about that, and they didn't want to renegotiate or change the numbers, so we pulled out of the deal."

In this case, there was no evidence that the Appellees made any representation to Hebert regarding the *value* of the assets conveyed in the APA. The valuation work was done by Dane himself after conducting an extensive review of the company's records, including paper and electronic files detailing the company's financials and QuickBooks records containing electronic copies of company records, and applying a valuation methodology of his choosing. Moreover, fair market value has generally been defined as the price property would bring if it were offered by a willing but not obligated seller and purchased by a willing but not obligated buyer. *Ford Motor Co. v. Cooper*, 125 S.W.3d 794, 799 (Tex. App.—Texarkana 2004, no pet.). Unaccepted offers to purchase property are not evidence of its fair market value. *See Mieth v. Ranchquest, Inc.*, 177 S.W.3d 296, 307 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Dane's testimony regarding what he would have *offered* to pay for the company is not evidence of its fair market value in the absence of testimony that the Appellees would have agreed to sell at that price. And there is ample evidence in the record to support the trial court's finding that Hebert acquired a sound and profitable commercial construction company. The parties agreed that the Appellees would be entitled to contingent price payments tied to gross revenue goals. The maximum contingent price payment available for the first year ranged from $55,950 if the company had gross revenues of at least $2 million up to $447,600 if the company achieved gross revenues of at least $5 million during the first year it was operated by Hebert. In fact, the gross revenues for the first year were $6 million. While the Appellees made no representations or guarantees regarding the company's profitability, the record evidence supports that Hebert got what he bargained for—a profitable construction company whose revenue stream has exceeded that which the parties agreed would entitle Appellees

12

to additional consideration; in essence a higher, not lower, purchase price.[17] The only evidence on which it relies—Dane's testimony regarding what he would have offered to pay—is too speculative to support an award of damages. Consequently, Hebert has not established that it is entitled to rendition of judgment in its favor for the amount it claims to have overpaid as a result of the allegedly misleading 2005 and 2006 financial statements.

Furthermore, even if Dane's testimony could be considered sufficient to support an award of damages, Hebert has failed to conclusively establish that the Appellees committed a material breach of the APA. Dane testified that he first discovered the mistakes he contends were contained in the 2005 and 2006 financial statements only after the closing of the Old Tremur sale. His own testimony, however, indicates that he had access to Old Tremur's financial information four months before closing and had possession of an electronic copy of the QuickBooks files three weeks before the July 2007 closing. This testimony reveals that, for several weeks prior to closing, Hebert had access to the paper and electronic records Dane relied upon to conduct the post-closing valuation on which Hebert bases its current claim. Based on Dane's access to this financial information prior to the sale, the trial court could have concluded that no material breach resulted from any failure to provide GAAP-compliant statements, as Dane had received the information that he now claims he lacked in another form.[18] We overrule Hebert's appellate issue seeking rendition of judgment in its

[17] The trial court found that Hebert judicially admitted that, but for the claims and offsets asserted in its causes of action against the Appellees, it otherwise owes the $447,600 contingent price payment to the Appellees. Hebert does not challenge this finding.

[18] While the trial court made no specific finding regarding the materiality of the breach resulting from any lack of GAAP-compliant statements, we "indulge every reasonable presumption in favor of the findings and judgment of the trial court." *See Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 251-52 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (explaining that "the presumption of validity will provide [an] omitted element by implication").

favor on both liability and damages arising from its allegation that the Appellees failed to provide GAAP-compliant 2005 and 2006 financial statements for Old Tremur.

*Bid Error*

Hebert next argues that Appellees breached the APA by failing to disclose a bid error relating to the Seton Women's Tower contract. Under section 3.08 of the APA, the Appellees warranted that Old Tremur had not "suffered any material adverse change in its financial condition, assets, liabilities, or business . . . that has affected, or should reasonably be expected [t]o affect, materially and adversely Seller's business, operations, assets, liabilities or financial condition" between April 30, 2007 and the time of the execution of the APA.

Here, the parties do not dispute that a bid error occurred on the Seton project. According to Chris, the senior estimator for Old Tremur indicated that the amount of the bid error was $168,760, while Chris himself testified that the error was "about a[n] $80,000 mistake." He testified that he did not remember whether he had told Dane about the mistake or not. Dane, on the other hand, testified that he was not told about the bid error on the Seton job, and estimated the damages to be between $182,000 and $218,000.

Chris also testified, however, that errors of the sort involved here occur frequently in the construction industry, and are often dealt with by the parties to the construction contracts. He further testified that the contractor on the Seton project indicated it would work with Tremur to cover the cost of the project. Chris testified that Tremur received six or eight change orders that covered most, if not all, of the cost of the error. He further testified that 98% of the work on the project had been completed and any losses stemming from the bid error were absorbed by Old Tremur before

closing, and that New Tremur received a $60,000 change order after closing for work done on the Seton project.

This testimony provides some evidence for the trial court to find that the bid error did not result in a material adverse change that "should reasonably be expected [t]o affect, materially and adversely[, the] business" and that Hebert suffered no economic injury due to the bid error. As Hebert's claim is based primarily on Dane's testimony and calculations regarding the bid error, we further conclude that the finding is not against the great weight and preponderance of the evidence.

*Back Charges and Warranty Work*

Next, Hebert contends that the Appellees breached the APA by refusing to pay back charges they incurred and warranty work they undertook prior to closing. According to Dane, back charges refer to work or materials for which revenues had been realized by Old Tremur but costs not yet incurred. Warranty work, on the other hand, refers to work to cover warranties on work that had previously been completed, with the term of warranty covering one year from the date of completion of the project.

Hebert argues that, under section 3.23 of the APA, the Appellees were obligated to reimburse Hebert for back charges. Section 3.23 states that, within 60 days of closing, Hebert and the Appellees would meet to determine the allocation of and payment for "costs, expenses, and prepaid items." Regarding warranty work, section 5.12 of the second amendment to the APA states that the Appellees would reimburse Hebert for any warranty work done by New Tremur.

We first examine the record for any evidence supporting the trial court's finding that the Appellees did not breach the APA by failing to reimburse Hebert for back charges and warranty

15

work.  Chris testified that, although Dane submitted invoices to him for back charges and warranty work, the claims were not supported by adequate documentation that was standard in the industry. Chris also testified that a review of the invoices submitted by Hebert contained vague or incomplete information, specified time billed to employees who were not working on the projects that were the subject of the invoices, and referenced inaccurate financial figures.

This testimony provides some evidence that the Appellees did not fail to pay back charges or warranty work it owed to Hebert, as the validity of the invoices submitted by Hebert was in dispute.  Further, reviewing the remainder of the record, we conclude that the trial court's finding is not against the great weight and preponderance of the evidence.  Hebert relies primarily on Dane's testimony and a one-page sheet of financial figures that he prepared detailing the amount allegedly owed to him by the Appellees.  The trial court, however, was free to credit Chris's testimony regarding the back charges and warranty work and to determine that Dane had not submitted any invoices that would have required the Appellees to reimburse Hebert.  Accordingly,  the evidence is legally and factually sufficient to support the trial court's judgment regarding back charges and warranty work.

*Percentage Completion*

Hebert argues that the evidence conclusively established that the Appellees breached the APA by failing to disclose the percentage completion for contracts in process at the time of closing.  Section 3.23 provides, in relevant part:

16

At closing, Seller shall certify to Purchaser the actual percentage completed on each Contract-in-process as of the Closing Date and that Seller has invoiced the customers only to the extent of such percentage of completion as of the Closing Date. Anything to the contrary notwithstanding, to the extent there are any costs, expenses or prepaid items applicable to the Contracts-in-process at Closing, Seller and Purchaser shall allocate such costs, expenses or prepaid items based on proper accrual of such costs, expenses or prepaid items attributable to percentage of work completed and billed by Seller as of the Closing Date.

Here, the parties disagree as to what conduct was required under the language of section 3.23. The parties' dispute centers around the term "actual percentage completed." Hebert argues that the "percentage completion" contemplated in section 3.23 refers to fiscal completion, that is, the comparison of actual costs incurred to estimated total costs of a project. Appellees, on the other hand, argue that "percentage completion" refers to physical completion, that is, the extent to which the project has been built or constructed, as determined by comparing the billing amount of work done to the total contract amount.

We first address, as a threshold matter, whether Hebert was barred by the APA from bringing this claim at trial.[19] Section 3.23 of the APA further states,

To the extent the parties disagree on an allocation of such costs, expenses or prepaid items, the Seller and Purchaser shall submit such information to the third party that certifies such completion to the customers for determination and thereafter attempt to resolve any discrepancies. To the extent such discrepancies remain unresolved, the parties shall have their remedies available as set forth in this Agreement and at law.

---

[19] Hebert primarily discusses this issue in its fifth issue on appeal, discussed below.

The trial court concluded that this language imposed a condition precedent on Hebert to submit percentage-completion disputes to a third party before filing suit, and accordingly that such claims were barred in this litigation because Hebert had concededly failed to do so.

A "condition precedent" that affects an obligation to perform is an act or event, occurring after the making of a contract, that must occur before there is a right to performance and before there can be a breach of contractual duty. *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992). Normally, in order to create a condition precedent, a contract must use a term such as "on condition that," "if," "provided that," or some similar conditional phrase. *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990). When these terms are not used, the contract provision will generally be construed as a covenant in order to prevent a forfeiture. *See PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 636 (Tex. 2008) (explaining that conditions precedent are not favored in law and courts tend to construe contract provisions as covenants rather than as conditions). In addition, although there is no requirement that these terms must be used, their absence is probative of the parties' intention that a promise was made instead of a condition imposed. *Hirschfeld Steel v. Kellogg Brown & Root*, 201 S.W.3d 272, 281-82 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

Here, the terms of section 3.23 state that the parties "shall" submit their claims to a third party before pursuing their claims in court. Section 3.23 does not include the terms "on condition that," "if," or "provided that," and the remainder of the contract does not indicate that the parties intended the section to recite a condition rather than a promise. Accordingly, we conclude that Hebert did not forfeit its percentage-completion claims.

18

We proceed to the meaning of "actual percentage completed" as used in section 3.23. In determining whether a party breached the contract in question, the court must determine what conduct is required of the parties under the contract. *E.P. Towne Center Partners v. Chopsticks*, 242 S.W.3d 117, 123-24 (Tex. App.—El Paso 2007, no pet.). Our primary objective in construing a written contract is to ascertain and give effect to the intentions that the parties have objectively manifested in the written instrument. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005). Contract terms are given their plain, ordinary, and generally accepted meanings. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). If a contract can be given a certain or definite legal meaning or interpretation, it is not ambiguous and is construed as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). A court may not rewrite the parties' contract or add to its language under the guise of interpretation. *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003).

The term "actual percentage completed" does not, in and of itself, have a definite and unambiguous meaning, as the plain meaning of the words themselves could refer to either physical completion or fiscal completion. Hebert argues that the context in which the term is used in the APA, however, sheds light on its proper interpretation. In section 3.23, the term is used in reference to the allocation and accrual of additional costs, expenses, and prepaid items. Further, section 3.23 also references section 1.04 of the APA, stating that the allocation of costs and expenses on the basis of percentage completion shall form the basis of adjustment to the purchase price as set forth in section 1.04. Section 1.04 states that the "purchase price for Contracts-in-process shall be equal to Seller's *cost* as of the Closing Date." (Emphasis added.) According to Hebert, this additional cost-

19

based analysis indicates that the "actual percentage completion" referenced in section 3.23 refers to fiscal completion of the contracts-in-process.

We disagree with Hebert's conclusions regarding the meaning of "actual percentage completed" in the APA. While the term is used to adjust financial terms in the APA, the adjustments could be based as easily on the physical completion of the project as on the fiscal completion of the project. Accordingly, we hold that the contract is ambiguous. *Columbia Gas Transmission Corp. v. New Ulm Gas*, 940 S.W.2d 587, 589 (Tex. 1996) (explaining that contract subject to two or more reasonable interpretations is ambiguous as matter of law).

An ambiguous contract creates a fact issue as to the parties' intent. *Id.* Accordingly, we turn to the findings of the trial court. The trial court determined that the parties' use of "percentage completion" in section 3.23 of the APA referred to physical completion, making an additional finding that such a definition comported with the industry standard in the construction industry. At trial, the court heard testimony from numerous witnesses, including the experts from each side, that the industry standard for percentage completion refers to physical completion of work.[20] This testimony provides some evidence to support the trial court's finding. Further, while the court heard some testimony indicating that the term has a different meaning in the accounting context, in light of the entire record the finding is not against the great weight and preponderance of

---

[20] Hebert's accounting expert was Mike Figer, a certified public accountant with 32 years' experience, including doing accounting for construction companies. Terry McGee, a certified public accountant with forty years' experience reviewing construction accounting documents, testified as an accounting expert on behalf of the Appellees. Both experts agreed that the industry standard for calculating percentage completion is to base it on physical completion of the work.

20

the evidence. Accordingly, as Hebert's claims regarding percentage completion rest on calculations of fiscal completion, its challenge fails.

We overrule Hebert's first two issues challenging the trial court's finding that the Appellees had "fulfilled their obligations under the APA and satisfied the intent of the sales transaction."

### Appellees' Counterclaims

In six issues, Hebert also asserts on appeal that the trial court erred in finding for the Appellees on their counterclaims. Specifically, Hebert contends that the trial court erred in finding that Hebert breached the APA by failing to operate New Tremur in accordance with prior practices, misrepresenting the credentials of its principals, failing to submit the dispute to a third party, failing to pay the Appellees for stored materials, withholding retainage monies, and failing to make the 2008 contingent price payment. We will address each contention in turn.

### Operation of New Tremur, Misrepresentation, and Failure to Submit Dispute to Third Party

In its third, fourth, and fifth issues on appeal, Hebert argues that the trial court erred in finding that Hebert breached the APA by failing to operate New Tremur in a manner consistent with prior practice, misrepresenting the qualifications of its principals, and failing to submit its dispute to a third party prior to bringing suit as required under the APA.[21] Hebert argues that the Appellees should take nothing on these claims.

---

[21] We have already addressed the trial court's finding regarding submission of the dispute to a third party when discussing Hebert's first two issues.

We need not address these issues, however, as the Appellees did not recover on these claims. *See State v. Bachynsky*, 770 S.W.2d 563, 566 (Tex. 1989) (declining to address evidentiary complaints that did not affect ultimate liability); *In re Grossnickle*, 115 S.W.3d 238, 253 (Tex. App.—Texarkana 2003, no pet.) ("[T]he trial court need only enter findings, or additional findings, on ultimate or controlling issues, rather than on mere evidentiary issues."). As the findings were unnecessary, they are not binding on appeal or remand, and we consequently "unfind" them. *See Keisling v. Landrum*, 218 S.W.3d 737, 743 (Tex. App.—Fort Worth 2007, pet. denied) (holding that court of appeals can "unfind" unnecessary findings of fact).

*Stored Materials*

In its sixth issue on appeal, Hebert argues that the trial court erred in awarding the Appellees $22,297.95 in "stored materials." Steven Moorhead, an assistant manager at Tremur, testified that stored materials are materials purchased for a specific project, and are therefore distinct from inventory, a definition that Chris agreed with. The trial court found that stored materials did not transfer to Hebert in the APA, and consequently Hebert was liable for the value of the stored materials in its possession.

Section 1.01 of the APA lists all of the assets that were transferred to Hebert pursuant to the sale of the company. While section 1.01 does not specifically list "stored materials" as an asset that would transfer to Hebert, section 1.01(f) indicates that the APA covers "[a]ny and all other assets used in the Seller's business (and not excluded as provided in Section 1.02 herein)."

Chris argues that stored materials differ from other kinds of assets that would have been transferred under the APA. According to his testimony, the materials in question concerned

projects that were completed prior to closing and consequently were not contemplated by the APA. However, Chris does not dispute that the stored materials were purchased by Tremur in the process of completing its construction projects. In addition, while Moorhead testified about the difference between stored materials and inventory, he did not claim that the stored materials at issue in this case did not belong to Tremur.

Based on this testimony, stored materials qualify as company "assets" according to the plain meaning of that term. Accordingly, as section 1.02 contains no mention of stored materials being excluded from transfer, we conclude that the stored materials in question were transferred to Hebert under the APA. We sustain Hebert's sixth issue, reverse the portion of the trial court's judgment awarding damages for stored materials, and render judgment that the Appellees take nothing on that claim.

*Offsets for Retainage and Contingent Price Payments*

In its seventh and eighth issues on appeal, Hebert argues that the trial court erred in concluding that it breached the APA by failing to make retainage payments and the 2008 contingent price payment for $447,600 to the Appellees.[22] While Hebert does not dispute that it owed the Appellees these payments, it claims that its obligations are offset due to its recovery in this case under the terms of the APA.

---

[22] In construction, the term "retainage" refers to a percentage of billings that are held back or retained by a contractor, usually in the amount of five to ten percent, pending completion of the project.

Section 9.14 of the APA states, "Notwithstanding anything to the contrary herein, [Appellees] agree that [Hebert] shall be entitled to credit and offset against any payments due by [Hebert] as a result of the transactions contemplated here[]by an aggregate amount equal to all amounts due [Hebert] by [Tremur]." Regarding offsets, Hebert argues the $771,950[23] in damages incurred as a result of the misrepresentations in the 2005 and 2006 financial reports excuse it from making the retainage and contingent price payments. However, as we affirm the trial court's judgment denying Hebert relief on that and other claims, we conclude that no offsets are available to Hebert as a result of this litigation. Hebert's seventh and eighth issues are overruled.

***Attorneys' Fees***

Although not assigned as an appellate issue, in its brief Hebert challenges the trial court's award of attorneys' fees and costs to the Appellees as the prevailing parties. As nothing in this opinion would upset that determination, we overrule this issue.[24]

---

[23] Although in its brief Hebert states the damages figure is $750,500, Dane testified that the damages suffered was the $771,950 difference between what it actually paid for Old Tremur and what it would have offered had it had satisfactory 2005 and 2006 financial statements.

[24] Hebert points out that the trial court's judgment awards the Appellees appellate attorneys' fees without conditioning the award on the Appellees' success on appeal. While the trial court's order does not expressly condition the award of appellate fees on a successful appeal, such a condition is necessarily implied because unconditional appellate fees are improper. *See Solomon v. Steitler*, 312 S.W.3d 46, 59-60 (Tex. App.—Texarkana 2010, no pet.); *see also Houston Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555, 586 (Tex. App.—Austin 2003, no pet.); *Westech Eng'g Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 205 (Tex. App.—Austin 1992, no writ).

## CONCLUSION

We reverse the portion of the trial court's judgment that awards the Appellees $22,297.95 for stored materials and render judgment that the Appellees take nothing on that claim. We affirm the remainder of the trial court's judgment.[25]

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed in part; Reversed and Rendered in part

Filed:   February 4, 2011

---

[25]  Authoring duties for this case were reassigned in November 2010.